

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-9-2001

# In Re: Cendant Corp

Precedential or Non-Precedential:

Docket 00-2185

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"In Re: Cendant Corp" (2001). *2001 Decisions.* Paper 100.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/100

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 1 of 2

Filed May 9, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2185

IN RE: CENDANT CORPORATION LITIGATION

JANICE G. DAVIDSON; ROBERT M. DA VIDSON, in his
capacity as trustee of Robert M. Davidson Charitable
Remainder Unitrust, and as co-trustee of Elizabeth A.
Davidson Irrevocable Trust, Emilie A. Davidson Irrevocable
Trust, John R. Davidson Irrevocable T rust, Emilie A.
Davidson Charitable Remainder Unitrust and John R.
Davidson Charitable Remainder Unitrust,
        Appellants

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 98-cv-01664)
District Judge: Honorable William H. W alls

Argued: November 16, 2000

Before: SLOVITER, AMBRO, and GARTH, Circuit Judges

(Filed: May 9, 2001)

        GERALD W. PALMER, ESQUIRE
          (Argued)
        RICKY L. SHACKELFORD, ESQUIRE
        EUGENIA L. CASTRUCCIO,
          ESQUIRE
        Jones, Day, Reavis & Pogue
        555 West Fifth Street, Suite 4600
        Los Angeles, California 90013

        Counsel for Appellants

SAMUEL KADET, ESQUIRE (Argued)
JOSEPH N. SACCA, ESQUIRE
KAREN CACACE, ESQUIRE
Skadden, Arps, Slate, Meagher &
 Flom LLP
Four Times Square
New York, New York 10036

Counsel for Appellee Cendant
Corporation

LEONARD BARRACK, ESQUIRE
GERALD J. RODOS, ESQUIRE
JEFFREY W. GOLAN, ESQUIRE
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103

MAX W. BERGER, ESQUIRE
DANIEL L. BERGER, ESQUIRE
JEFFREY N. LEIBELL, ESQUIRE
Bernstein Litowitz Berger &
 Grossmann LLP
1285 Avenue of the Americas
New York, New York 10019

Counsel for Appellees California
Public Employees' Retirement System,
New York State Common Retirement
Fund, and New York City Pension
Funds

2

OPINION OF THE COURT

AMBRO, Circuit Judge:

Janice G. Davidson and Robert M. Davidson, in their individual capacities and as trustees of certain trusts (collectively, the "Appellants"),1 appeal from a final decision of the United States District Court for the District of New Jersey (the "District Court"). That decision, involving a securities class action lawsuit (the "class action"), held that Appellants, as a result of their failure to opt out of the class, were subject to the class settlement, and could not further pursue arbitration in California of claims they brought against Appellee Cendant Corporation ("Cendant").

Appellants have presented this Court with three issues on appeal. First, they assert that the District Court erred in holding that the class included them. Second, Appellants argue that the District Court abused its discretion in failing to grant them an extension of time to opt out of the class. Finally, they contend that the District Court erred in enjoining their arbitration claims and, in doing so, violated the Federal Arbitration Act, 9 U.S.C. S 1 et seq. (the "FAA"). After considering these arguments, we hold that the District Court did not err in finding that Appellants were members of the class and did not abuse its discretion in refusing to grant them an extension of time to opt out of the class. However, we hold that the District Court did err in enjoining, in its entirety, Appellants' arbitration. While Appellants are subject to the class settlement, and therefore are enjoined from pursuing any claims that fall within that settlement, they are not enjoined from pursuing, in arbitration, any claims that fall outside the settlement's scope.

I. Facts and Procedural History

In 1982, Janice Davidson founded Davidson &

_____

1. Janice G. Davidson and Robert M. Davidson, solely in their individual capacities, are collectively referred to as the "Davidsons."

3

Associates, Inc. ("DAI"), an entity later incorporated in California in 1984. From 1984 until 1996, the Davidsons were officers and directors of DAI. In that capacity, they led the company as it developed, manufactured, published, and distributed educational and entertainment softwar e products for home and school use. The company derived its revenues from sales to software distributors, specialty software stores, computer superstor es and mass merchandisers in international markets, international catalog sales to schools and teachers, and thr ough technology licensing and software manufacturing.

In April 1993, DAI issued an initial public of fering ("IPO"), selling 200 million shares of common stock at $13 per share. Thereafter, DAI listed its stock on NASDAQ. After the IPO, the Davidsons controlled approximately 70% of DAI's outstanding common stock, with a majority of that stock in various charitable and irrevocable trusts contr olled by the Davidsons as trustees.2

Following the IPO, DAI received a number of unsolicited inquiries with respect to possible mergers, acquisitions, joint ventures, and direct investments. No initial inquiry resulted in a transaction. However, in June 1995, the Davidsons were approached by CUC Inter national, Inc. ("CUC") in connection with its possible acquisition of DAI. Although the first round of negotiations ended without an agreement, the negotiations were r esumed in December 1995 and continued until July 1996, when CUC acquir ed DAI through a merger and DAI became a subsidiary of CUC.

In connection with the merger, DAI shar eholders received 85/100 of a CUC share in exchange for each DAI share, as negotiated in part based on the market price of each company's shares. As a result, the Davidsons received 1,259,634 shares of CUC common stock, and the trusts controlled by the Davidsons received 31,245,465 shares of

_____

2. The Davidsons claim to have controlled 78% of DAI's outstanding shares immediately after the IPO. Cendant alleges that, at the time DAI merged with CUC International, Inc. (later Cendant), the Davidsons controlled 71.3% of the outstanding DAI common shares (1.4% in each person's individual capacity and 68.5% in the various trusts).

4

CUC common stock. The merger agreement also contained an arbitration provision3 and a "bust out" provision.4

Following the merger, the Davidsons became directors of CUC and officers and directors of CUC's DAI subsidiary. In addition, the DAI shares owned by the public were exchanged for common shares of CUC that could be immediately traded over the New York Stock Exchange ("NYSE"). Appellants' shares, however , could not be immediately traded. Due to the number of shar es Appellants received, they were deemed affiliates of CUC and could not publicly trade their stock on the NYSE unless their shares were subsequently made part of a registered public offering separate from the DAI/CUC merger.5

In January 1997, following several months of acrimony between CUC senior management and the Davidsons, CUC terminated them as corporate officers though they remained directors. In March 1997, Appellants served CUC with a demand for arbitration, asserting claims in connection with the DAI/CUC merger agr eement and specifically as to the Davidsons' employment responsibilities with CUC. In May 1997, Appellants and

---

3. The arbitration provision provided:

    Any controversy, dispute or claim arising out of or relating to this
    Agreement or the breach hereof which cannot be settled by mutual
    agreement . . . shall be finally settled by arbitration . . . .
The parties
    agree that this clause has been included to rapidly and
    inexpensively resolve any disputes between them with respect to this
    Agreement, and that this clause shall be gr ounds for dismissal of
    any court action commenced by either party with r espect to this
    Agreement, other than post-arbitration actions seeking to enforce an
    arbitration award.
4. The "bust out" provision per mitted DAI to terminate the merger agreement if CUC's average share price fell below $29 per share in a defined period in order to protect the bargained-for value to be received by the DAI shareholders.

5. As discussed below, Appellants' shares were restricted pursuant to the Securities Act of 1933. See 17 C.F.R.S 230.145; infra note 16 and accompanying text. However, the restrictions could be easily circumvented. In fact, just four months after the merger, in October 1996, Appellants sold more than twenty million of the shares they received in the DAI/CUC merger.

CUC entered into a settlement agreement (the "Settlement Agreement"), which provided, inter alia, for the Davidsons to receive options to purchase 1.6 million shares of CUC common stock6 in exchange for a r elease by Appellants and the Davidsons' resignation from all r emaining positions with CUC. The Settlement Agreement also contained an arbitration provision.7

Thereafter, on December 18, 1997, CUC and HFS, Inc. ("HFS") merged, with CUC as the surviving company. Upon completion of the merger the company became known as Cendant.

After the close of the stock market on April 15, 1998, Cendant publicly disclosed that accounting and bookkeeping irregularities had occurred at CUC and that it would restate its earnings for 1997. This caused its stock value to plummet 46% and triggered several class action lawsuits on behalf of investors who purchased CUC or Cendant stock during 1997. In late August 1998, Cendant further disclosed that the irregular accounting activity dated back to 1995, and that in addition to the 1997 restatement, new earnings would be r eleased for 1995 and 1996. This second disclosure triggered several more lawsuits involving purchases of CUC securities during the

_____

6. Interestingly, at oral argument Cendant conceded that these 1.6 million options are not, and have never been, considered part of the class action.

7. That provision stated:

> Notwithstanding anything to the contrary contained in this Agreement or the Surviving Agreements and Rights, any controversy, dispute or claim arising out of or relating to this Agreement or any of the Surviving Agreements and Rights or the breach hereof or thereof which cannot be settled by mutual agreement shall be finally settled by binding arbitration in accordance with the Federal Arbitration Act . .. . The parties agree
> that this Section has been included to rapidly and inexpensively resolve any disputes between them with r espect to this Agreement or any of the Surviving Agreements and Rights, and that this Section shall be grounds for dismissal of any court action commenced by any party with respect to this Agr eement or any of the Surviving Agreements and Rights, other than post-arbitration actions seeking to enforce an arbitration awar d.

broader period of alleged fraud. This new time frame presumably included the time during which Appellants engaged in the merger transaction with CUC. In total, Cendant restated and reduced its pr e-tax operating income for the relevant periods by approximately $500 million.

Between April and August 1998, at least sixty-four purported securities fraud class action lawsuits wer e filed as a result of the April 1998 disclosur e. By order of the Judicial Panel on Multidistrict Litigation (the"MDL Panel"), all Cendant cases relating to the accounting irregularities were transferred to the District of New Jersey. During the process to consolidate the class actions in the District of New Jersey, fifteen motions were filed for appointment as the lead plaintiff. On May 29, 1998, the District Court consolidated all of the accounting irregularity actions pending against Cendant under the caption In r e Cendant Corporation Securities Litigation.8  On September 8, 1998, the District Court appointed the California Public Employees' Retirement System, the New Y ork State Common Retirement Fund, and the New York City Pension Funds, all public investment funds, as lead plaintif fs (collectively, the "Lead Plaintiffs").

Following a case management conference, the Lead Plaintiffs on December 14, 1998, filed their Amended and Consolidated Class Action Complaint (the "Complaint"). That Complaint defined the class repr esented as

> [a]ll persons and entities who purchased or otherwise acquired publicly traded securities . . . either of Cendant or CUC during the period beginning May 31, 1995 through and including August 28, 1998 and who were injured thereby, including all persons or entities who exchanged shares of HFS common stock for shares of CUC stock pursuant to the Registration

_____

8. While this Court has heard arguments on and issued decisions in other Cendant cases involving different subject matters, see, e.g., In re Cendant Corp. Prides Litig., 233 F.3d 188 (3d Cir. 2000) (hereinafter Cendant Prides I); In re Cendant Corp. Prides Litig., 235 F.3d 176 (3d Cir. 2000) (hereinafter Cendant Prides II); In re Cendant Corp. Prides Litig., 243 F.3d 722 (3d Cir. 2001), those decisions do not affect the outcome of this case.

7

Statement . . . . Excluded from the Class ar e: (i) defendants; (ii) members of the family of each individual defendant; (iii) any entity in which any defendant has a controlling interest; (iv) officers and directors of Cendant and its subsidiaries and affiliates; and (iv) [sic] the legal representatives, heirs, successors or assigns of any such excluded party.

Also on December 14, 1998, the Lead Plaintif fs filed a motion for class certification. That motion defined the class as

all persons and entities who purchased or acquired Cendant Corporation ("Cendant" or the "Company") or CUC International, Inc. ("CUC") publicly traded securities during the period May 31, 1995 thr ough August 28, 1998, inclusive (the "Class Period"), and were injured thereby, including but not limited to all persons who exchanged their HFS Incorporated ("HFS") common stock for common stock of CUC pursuant to a Registration Statement and Joint Proxy Statement/Prospectus dated August 28, 1997. Excluded from the Class are defendants her ein, members of the immediate family of each of the Individual Defendants, officers and directors of Cendant, parents, subsidiaries and affiliates of the Company, and the legal representatives, heirs, successors or assigns of any such excluded party. . . .

Lead Plaintiffs asserted they would be adequate class representatives because they "allege a continuing course of conduct that affected all Class members, whether they bought early or late in the Class Period, or whether they bought Cendant securities on the open market or pursuant to the Registration Statement and Joint Prospectus in the Merger."

Three days later, on December 17, 1998, Appellants initiated arbitration in California against Cendant, seeking rescission of the Settlement Agreement and damages resulting from receipt of the overvalued CUC shares in connection with the DAI/CUC merger. In response, on January 21, 1999, Cendant filed suit in the United States District Court for the Central District of Califor nia (the

8

"California Central District") seeking to enjoin the arbitration. Cendant's complaint alleged violations of its rights under the FAA and did not interpose the existence of the class action as a ground for seeking injunctive relief from the arbitration.

Meanwhile, on January 27, 1999, the District Court granted Lead Plaintiffs' motion for class certification. Without restating or affirmatively announcing the class definition, the District Court ordered the certified class to represent "all purchasers or acquirers of Cendant Corporation or CUC International, Inc. publicly traded securities between May 31, 1995 and August 28, 1998 who were injured thereby."

In response to Cendant's motion to enjoin pr eliminarily the California arbitration and Appellants' motion for summary judgment to dismiss Cendant's complaint,filed on February 17, 1999, the California Central District, on April 14, 1999, found in favor of Appellants. It ruled that Appellants were entitled to summary judgment because "the evidence indicates that claims for r escission of the agreement are covered by the br oad arbitration provision." The California Central District entered afinal order dismissing Cendant's injunction action, though it did not explicitly compel arbitration. Cendant appealed that order.9

In an exercise of caution, Appellants, on April 14, 1999, filed a "placeholder" action in the Califor nia Central District. They did so to ensure that, in the event a court determined that some or all of their claims were not arbitrable, they nonetheless would comply with the one year statute of limitations applicable to their claims. That complaint expressly stated that they wer e not waiving their right to arbitrate.10

_____

9. That appeal, Cendant Corp. v. Davidson, J., et al., No. 99-55788, is currently pending before the United States Court of Appeals for the Ninth Circuit. The parties agreed to stay further proceedings in the arbitration until the Ninth Circuit rules on Cendant's appeal.
10. "[T]his Complaint is filed in or der to ensure that plaintiffs have brought an action with respect to the claims asserted herein within any applicable statute of limitation, . . . in the event that any of plaintiffs'
claims are determined not to be arbitrable . . . . By bringing this action,
however, plaintiffs do not intend to waive, and are not waiving, their rights under various agreements to arbitrate all or any of the claims asserted herein."

Meanwhile, the District Court, on August 6, 1999, approved the form, and order ed dissemination, of the notice to be sent in the class action. In that order , the District Court required that Cendant make available to Lead Plaintiffs the stock transfer recor ds reflecting the names and addresses of Cendant's and CUC's shar eholders. The District Court further required Lead Plaintiffs to mail notice to all record holders of Cendant and CUC stock and to all brokers in the transfer records, and to publish notice of the class action on three different days in The Wall Street Journal, The New York T imes (National Edition), and the Dow Jones Business Newswire. The District Court determined that this notice "constitute[d] the best notice practicable under the circumstances to members of the Class, and will satisfy the requirements of constitutional due process and Rule 23 of the Federal Rules of Civil Procedure."

Thereafter, Cendant petitioned the MDL Panel to transfer Appellants' placeholder action pending in the California Central District. On August 12, 1999, the MDL Panel transferred that action from the Califor nia Central District to the District of New Jersey pursuant to 28 U.S.C.S 1407.

On October 8, 1999, the accounting firm of Heffler, Radetich & Saitta LLP, the Class Administrator, mailed the class notice to all known potential class members, as well as 239 brokerage firms and 141 banks and other institutions. Initially, 19,069 notices were sent via first class mail. Then, through November 29, 1999, the Class Administrator mailed notice to numerous other potential plaintiffs based on written requests, telephone requests, names supplied by nominees, and bulk requests by nominees. In all the Class Administrator sent 261,224 notices.

Of these notices, at least ten were mailed to Appellants at three separate addresses -- two in Palos Verdes, California and one in Torrance, California. The notices mailed to the Palos Verdes addresses were all returned to the Class Administrator by the United States Postal Service as undeliverable, with no forwarding address. The notice sent to the Torrance address was not r eturned. However, the Davidsons claim never to have received the individual

10

notice because they had moved to Incline Village, Nevada and did not inform Cendant of their change of address. The Davidsons also claim to have missed the published notice.

Both the individually mailed notices and the published notice included the definition of the class as stated in the Complaint. Further, in accordance with an order of the District Court, the class notice warned potential class members that if they failed to follow the specific exclusion procedures, they would be deemed class members and would be bound by any settlement or judgment. The individual notice stated:

> 15. If you are a member of the Class . .. and you wish to remain a member of the Class, you need not take any further action at this time. . . .
>
> 16. As a Class member (unless you request to be excluded from the Class), you will be bound by any judgment, whether favorable or unfavorable, enter ed in this Action. . . .
>
> . . .
>
> 19. How To Be Excluded From The Class: YOU WILL BE EXCLUDED FROM THE CLASS ONLY UPON SPECIFIC REQUEST AS DESCRIBED BELOW. If you request to be excluded, you will not be entitled to share in the proceeds of a recovery obtained by settlement or favorable judgment in the litigation, if any. Y ou also will not be bound by a judgment, if any, in favor of either the Class or defendants.
>
> 20. If you wish to be excluded from the Class, you must so indicate by filing a written Request for Exclusion, POSTMARKED ON OR BEFORE December 27, 1999 . . . .

The published notice similarly warned:

> IF YOU PURCHASED OR ACQUIRED THE PUBLICL Y TRADED SECURITIES . . . OF CENDANT OR CUC AS DESCRIBED ABOVE, AND YOU DO NOT REQUEST EXCLUSION FROM THE CLASS, YOUR RIGHTS WILL BE AFFECTED BY THIS LITIGATION. . . .

11

> If you wish to be excluded from the Class, you must, in accordance with the instructions contained in the Notice, submit a written request for exclusion . . . .

Additionally, the class action received considerable media coverage independent from the published notices.

On December 7, 1999, almost three weeks befor e the final opt-out date, Cendant announced a pr oposed settlement that would require it to pay $2.85 billion to the class members (the "Class Action Settlement"). 11 On December 27, 1999, pursuant to the class notice, the opt-out period closed. The Appellants never filed a written opt-out, as required by the District Court and the class notice.

In February 2000, Appellants claim that Cendant indicated, for the first time, that it would take the position that they were class members. On March 17, 2000, Cendant and the Lead Plaintiffs submitted settlement documents to the District Court, including a Plan of Allocation for the distribution of settlement pr oceeds among class members. Then, on March 29, 2000, the District Court preliminarily approved the Class Action Settlement12 and enjoined all actions or claims that were contemplated by it. Pursuant to the order containing that approval, the Class Administrator on April 7, 2000, mailed notice of the Class Action Settlement and proof of claim for m packages to Appellants at their new Nevada address. This package included Lead Plaintiffs' Plan of Allocation of the settlement funds.

The Plan of Allocation provided that any losses class members suffered from their transactions in CUC and Cendant securities would be offset by any gains they received through transactions in CUC and Cendant securities prior to Cendant's April 15, 1998 disclosure of the alleged accounting fraud. Thus, any damages Appellants suffered as a result of the DAI/CUC merger would be offset by the substantial gains they received in the

_____

11. It is interesting to note that the Davidsons never claim that they were
unaware of this announcement.

12. Formal approval of the Class Action Settlement occurred on August 15, 2000.

12

sale of over twenty million shares of the artificially-inflated stock before the disclosure.

On April 27, 2000, possibly after learning of their discounted recovery under the Class Action Settlement and Plan of Allocation, Appellants filed a motion seeking clarification of the class definition, or in the alternative an extension of the time period to opt out of the class. Cendant opposed Appellants' motion, and cross-moved to enforce the injunction against other proceedings. The Lead Plaintiffs filed a brief responding to Appellants' motion, asserting that they did not represent the interests of Appellants in prosecuting their claims.13

Finally, on June 20, 2000, the District Court ruled that Appellants were within the class, denied them an extension of time to opt out, and enjoined them from arbitrating their claims in California. See In re Cendant Corp. Sec. Litig., 194

_____

13. The Lead Plaintiffs stated:

Lead Plaintiffs agree that the Davidsons are excluded from the Class. The Davidsons were officers and dir ectors of CUC and its DAI subsidiary during the Class Period. CUC was the surviving entity in the merger of HFS into CUC; the name was simply changed to Cendant after the merger. Thus, while it was necessary to make it clear to Class Members in the Notice of Pendency that whether they purchased Cendant or CUC publicly-traded securities, they were all part of the same Class, the exclusion of Cendant's officers and directors applied to all such officers and directors, whether before or after the name change. Indeed, it would make no sense to exclude only officers and directors of Cendant after the merger, when it was CUC's fraudulent financial statements -- issued by the officers and directors of the company before the mer ger (when the company was named CUC) -- that formed the heart of this Action. Lead Plaintiffs did not prosecute this class action to pr otect the interests of Cendant's officers and directors, whether they served before or after the CUC/HFS merger, and such officers and directors should not be allowed to participate in the distribution of the Settlement Funds that have now been recovered.

As a result, the Davidsons are, and should be, excluded from the Class.

At oral argument before the District Court the Lead Plaintiffs took the position that the trust shares were included in the class.

13

F.R.D. 158, 165–66 (D.N.J. 2000). First, the District Court held that Appellants were within the class because their shares were publicly traded within the meaning of the class definition. See id. at 164. Second, it looked to the class exclusions and determined that, despite the exclusion of officers and directors of Cendant, the Davidsons, as former officers and directors of CUC, were not excluded from the class. See id. Further, it found that Appellants did not meet their burden of showing excusable neglect for an extension of time to opt out of the class pursuant to Federal Rule of Civil Procedure 6(b), and therefor e denied their request. See id. at 165. Finally, the District Court held that it had the authority to enjoin the ongoing California arbitration between Appellants and Cendant in order to implement the proposed Class Action Settlement, and thus it enjoined that arbitration. See id. at 165–66.

On July 19, 2000, Appellants filed a timely notice of appeal.

II. Discussion

A. Class Membership

Appellants claim initially that the District Court erred in holding that they were class members. The District Court concluded that their shares were publicly traded, and thus were within the class definition.14  See Cendant Sec. Litig., 194 F.R.D. at 163–64. It further found that the Davidsons were not "officers and directors of Cendant and its subsidiaries and affiliates," and concluded that they did not qualify for exclusion from the class on those grounds. See id. at 164.

We accord a District Court's interpr etation of its own orders "particular deference." In re Fine Paper Antitrust Litig., 695 F.2d 494, 498 (3d Cir . 1982). The District Court, in determining whether Appellants were class members, interpreted its own orders, the or der certifying the class

_____

14. As previously noted, the class definition included "all persons and entities who purchased or acquired Cendant. . . or CUC . . . publicly traded securities during the period May 31, 1995 thr ough August 28, 1998," and excluded "officers and dir ectors of Cendant."

14

and the order approving the class notice, both of which contained the class definition. Therefor e, its interpretation of the class definition in those orders is entitled to "particular deference."15

1. The Class Definition

The class definition begins: "[A]ll persons and entities who purchased or acquired" stock. Appellants received their shares through the DAI/CUC merger . This Court has defined "purchasers" of stock to include those who buy on an open market and those who exchange stock in one company for stock in another company pursuant to a merger between the two companies or an acquisition of one company by the other. See In re Penn Cent. Sec. Litig., 494 F.2d 528, 533 (3d Cir. 1974) (citing SEC v. Nat'l Sec. Inc., 393 U.S. 453, 467 (1969)). By virtue of the DAI/CUC merger, Appellants "purchased" stock.

The class definition then requires that the purchaser or acquirer obtained "Cendant . . . or CUC . . . publicly traded securities." As a result of the DAI/CUC mer ger Appellants received a total of 32,505,099 shares of CUC stock. The question that we must address is whether that stock was "publicly traded" so as to fall within the class definition.

Appellants argue the District Court err ed in holding that their shares were publicly traded securities because the Court did not give the term "publicly traded" its commonly-used definition. They assert that "publicly traded" means

_____

15. Appellants' attempt to distinguish Fine Paper by relying on Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co., 824 F.2d 249, 254 (3d Cir. 1987), is unfounded as the Pittsburgh T erminal court itself distinguished its case from Fine Paper as well as the current situation. Pittsburgh Terminal did not involve a court interpreting its own order, but instead dealt with the court interpreting a stipulation by the parties. "There is no
basis for extending this principle [of "particular deference" articulated in
Fine Paper] to demand similar deference in the present case to the district court's interpretation of a stipulation underlying a previous order
. . . ." Id. Moreover, "Fine Paper is further distinguishable because it was
a class action and because it involved distribution of a single fund." Id. at 254 n.5. Just as in Fine Paper, this case is a class action where the District Court is interpreting its own or ders and ultimately distributing a single fund of $2.85 billion.

15

tradeable on the public markets. Because the shar es they received were newly issued, had not been traded on any market, and were precluded when issued fr om being traded on those markets, Appellants argue that these shares could not, in the plain sense of the term, have been"publicly traded." In essence, they contend that because their shares were not immediately tradeable publicly, they could not be deemed "publicly traded" within the meaning of the class definition. We believe the publicly traded/publicly tradeable argument to be a distinction without a dif ference and agree with the District Court that Appellants' shar es were indeed "publicly traded" securities.

At the outset, Appellants' argument does not paint the picture fully. While it is true that their shar es differed from the shares issued to other public investors as a result of the DAI/CUC merger (the difference being that Appellants' shares were not immediately tradeable), that difference was not due to the quality of the shares received. Appellants received exactly the same type of shares of common stock as all other DAI shareholders, specifically a class of CUC security that was publicly traded on the NYSE.

The restriction on sale of the CUC stock held by Appellants emanated solely from the quantity of shares they received as a result of the mer ger, not in any way from the type of security they received. Due to the number of shares Appellants received, they wer e deemed to be affiliates of CUC and their ability immediately to resell these shares was subject to the limitations of the Securities Act of 1933,16 as well as the ter ms of affiliate agreements signed by the Davidsons in connection with the DAI/CUC merger agreement.17

_____

16. While Cendant alleges that the restriction is based on Rule 144A, it seems that Appellants were restricted fr om immediately selling their shares pursuant to Rule 145. See Cendant Sec. Litig., 194 F.R.D. at 163. That rule deems Appellants to be affiliates for Rule 145 purposes and thus subjects them to the registration r equirements for sale of those securities pursuant to the Securities Act of 1933. See 17 C.F.R. S 230.145.

17. The affiliate agreements, signed by the Davidsons, provided in part, "I understand that I may be deemed to be an `affiliate' of the Company, as such term is defined for purposes of Rule 145 . . . promulgated under the Securities Act of 1933 . . . and that the transferability of the shares
of common stock . . . is restricted."

These restrictions could be avoided entir ely, however, if Appellants were to sell shares of CUC stock under any subsequent registration statement. Noticing the burden placed on Appellants, CUC granted Appellants liberal rights to demand a second registration statement that would allow them to "piggyback" their shares and ther efore remove any sales restriction from the securities. In fact, Appellants did just that, selling more that twenty million shares just four months after the transfer. In all, by January 16, 1998, Appellants had disposed of more than twenty-five million of their thirty-two and a half million CUC shar es for proceeds totaling more than $635 million. This exposes a logical disconnect in Appellants' argument. Having traded publicly tens of millions of shares of CUC common stock so soon after the DAI merger, and then to claim that they are not "publicly traded" securities within the class definition, is a non sequitur. Thus, despite the restriction on immediate resale, Appellants did receive "publicly traded" securities within the meaning of the class definition.

The class definition sets the relevant period of trading as "May 31, 1995 through and including August 28, 1998." The DAI/CUC merger, in which Appellants "purchased" their shares, took place in July 1996. This clearly places Appellants within the relevant period under the class definition.

The relevant part of the class definition concludes: "and who were injured thereby." Appellants' alleged injury is shown by the fact that they pursued their claims against Cendant. Yet they posit that the class did not adequately represent them in redressing the injury they actually received, as the class relied on the fraud on the market theory. Appellants proffer that the claims pursued by the Lead Plaintiffs on behalf of the class r elating to the accounting irregularities affected those who purchased CUC and/or Cendant stock on the open market. However , they argue that the only way the fraud on the market theory could have affected the DAI/CUC merger was to keep CUC's price inflated so that the "bust out" pr ovision that could have terminated that merger was not triggered. Because Appellants did not purchase their securities on the open market, but instead acquired them through individual

17

negotiations with CUC, they argue that the fraud on the market theory is not applicable to them.

We find this argument unavailing. First, the fraud on the market theory did affect the DAI/CUC mer ger because, during the negotiations between DAI and CUC, the purchase price was determined by "r eference to, among other factors, the range of prices at which CUC stock was trading." This demonstrates that Appellants' Rule 10(b)(5) claim rests, at least in part, on the same fraud on the market theory pursued by the class, as the mer ger negotiations were based on artificial market prices. In fact, Cendant points out that membership in the class actually gave Appellants an advantage in their Rule 10(b) claim by lessening their burden of proof because in a typical Rule 10(b) claim a plaintiff must show individual r eliance on a material misstatement, whereas under the fraud on the market theory reliance is presumed. See In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113–14 (9th Cir. 1989).

Cendant further points this Court to In r e Discovery Zone Securities Litigation, 181 F.R.D. 582 (N.D. Ill. 1998), to show that Appellants' fraud on the market ar gument is incorrect. In that case, the court consider ed whether an entity that acquired newly-issued shares of common stock through a merger that were not immediately tradeable (just as Appellants' shares were not) was a member of a class proceeding under a fraud on the market theory. See id. at 590–92. The court concluded that the fact that the acquiring entity's claims were based on its individual negotiations with the defendant, rather than on pur chases in the open market, did not exclude it from a"fraud-on-the-market class" given that its claims and the claims of open market purchasers were based on the same"overall scenario" of conduct by the defendants. See id. at 591–92; see also In re Scorpion Techs., Inc. Sec. Litig., No. C 93-20333, 1994 WL 774029, at *5 (N.D. Cal. Aug. 10, 1994); In re Nat'l Student Mktg. Litig., M.D.L. Docket No. 105, 1973 WL 431, at *5 (D.D.C. Oct. 2, 1973).

Appellants cannot argue that their claims ar e based on a qualitatively different "overall scenario" from the claims raised in the class action. Under Discovery Zone ,

18

Appellants' claims would be properly included in the class despite their individual negotiations with CUC that shape their particular fraud claim. Accordingly, we believe that Appellants' injuries fit within the class definition.

2. Class Exclusions

Having concluded that Appellants are within the class because they purchased or acquired CUC publicly traded securities during the relevant class period and allege they were injured thereby, we must next determine whether they fall within any of the exclusions. The only exclusion possible is that the Davidsons are excepted fr om the class as "officers and directors of Cendant." The District Court determined that, pursuant to the plain meaning of the class definition, the exclusion only disqualified officers and directors of Cendant, and did not exclude for mer officers and directors of CUC. See Cendant Sec. Litig., 194 F.R.D. at 164.

The Davidsons submit that Cendant, as the surviving entity of the CUC/HFS merger, is mer ely a continuation of CUC and therefore the exclusion includes all officers and directors of CUC and Cendant. Most important, the Davidsons point to the Lead Plaintiffs' belief that they did not represent the interests of the Davidsons, as Lead Plaintiffs believed that the Davidsons wer e excluded from the class due to their former positions as officers and directors of CUC. See supra note 13.

Again, we accord "particular deference" to the District Court's interpretation of its own orders. See Fine Paper, 695 F.2d at 498. While we find the Lead Plaintiffs' statement to be of interest, we do not believe that the District Court erred in finding that the officer and director exception did not apply to the Davidsons. In fact, the plain meaning rule, as well as other canons of construction, require such a finding.

When the language of an instrument is plain, we look no further than the words of that document itself to determine its meaning. See Tamarind Resort Assocs. v. Govt. of V.I., 138 F.3d 107, 110 (3d Cir. 1998) ("It is axiomatic that where the language of a contract is clear and unambiguous, it must be given its plain meaning."); Mellon Bank v. Aetna

19

Bus. Credit, Inc., 619 F.2d 1001, 1010 (3d Cir. 1980) ("A court is not authorized to construe a contract in such a way as to modify the plain meaning of its wor ds, under the guise of interpretation.") (internal quotations omitted); see also Richard A. Lord, 11 Williston on Contracts S 32:3, at 408 (4th ed. 1999).

Further, we look by analogy to canons of interpretation for statutes. One is that "[w]e presume that [Congress's] clear use of different terminology within a body of legislation is evidence of an intentional dif ferentiation." Lankford v. Law Enforcement Assistance Admin., 620 F.2d 35, 36 (4th Cir. 1980); accord Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congr ess includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotations omitted); Barmes v. United States, 199 F.3d 386, 389 (7th Cir. 1999) ("Different language in [a] separate clause in a statute indicates Congress intended distinct meanings."); Cabell Huntington Hosp. v. Shalala, 101 F.3d 984, 988 (4th Cir. 1996) ("Where Congress has chosen dif ferent language in proximate subsections of the same statute, courts are obligated to give that choice effect.") (internal quotations omitted); Fla. Public Telecomms. Assoc., Inc. v. FCC, 54 F.3d 857, 860 (D.C. Cir. 1995) (stating that when Congress uses different language in differ ent sections of statute, it does so intentionally). Cf. Booth v. Churner, 206 F.3d 289, 294 (3d Cir. 2000) ("[It is the] normal rule of statutory construction that identical words used in differ ent parts of the same act are intended to have the same meaning.") (internal quotations omitted). Thus, the choice of dif ferent words to address analogous or related issues signifies different meanings. See E. Allan Farnsworth, 2 Farnsworth on Contracts S 7.11, at 284 & n.12 (2d ed. 1998).

Similarly, we look to the canon expressio unius est exclusio alterius (the expression of one thing is the exclusion of another) for the proposition that when parties list specific items, without any more general or inclusive term, they intend to exclude unlisted items, even though they are similar to listed items. See id.  at 281. Finally, this

20

Court has stated that we "must give full cr edit to the language the parties have chosen to include -- or not include -- in their agreement." Orlando v. Interstate Container Corp., 100 F.3d 296, 301 (3d Cir. 1996).

Applying these rules of interpretation to the language of the class definition, we find that the District Court correctly interpreted the class exclusion to include only officers and directors of Cendant and not any of its pr edecessors in interest, including pre-merger officers and directors of CUC. The language used in the class definition clearly excludes only Cendant's officers and directors. Because the Davidsons were never officers and dir ectors of Cendant, the plain language excludes them.

Looking to the class definition as a whole supports the conclusion that the intention was only to exclude Cendant's officers and directors. We need not look further than the first sentence of the class definition to confirm this view. It begins by stating that the class intends to cover all purchasers of Cendant or CUC securities. This indicates that the drafter, as well as the adopting court, intended to include purchasers of either company's stock. However, the language of the class exclusion only excludes officers and directors of Cendant. Following the canons of construction, the choice of different words --"Cendant or CUC" as opposed to "Cendant" -- indicates that the two clauses have different meanings. To conclude otherwise is counterintuitive.

Further, we look to the canon of expr essio unius est exclusio alterius for the proposition that when parties list specific items, without a term of general inclusion, they intend to exclude unlisted items. Here the class definition's language indicates that it intentionally excluded CUC from the class exception. Because we must give ef fect to the language included, as well as not included, we conclude that the District Court was correct in holding that the Davidsons were not excluded from the class as former officers and directors of pre-mer ger CUC.

3. Opt-Out by Implication

After finding that Appellants fit within the class definition, and that the Davidsons are not excluded under

21

the exceptions, we must determine if Appellants opted out of the class. At oral argument and thr oughout their briefs, Appellants concede that they did not follow the for mal opt-out procedure provided in the class notice, but appear to argue that they impliedly opted out of the class. They contend that the purpose of an opt-out requir ement is to force a party to take a position in or out of a class so that, in attempting to resolve claims against it, a defendant knows the exposure it faces, both to the class and to the opt-outs. Appellants further argue that they clearly took a position outside the class by filing the Califor nia arbitration and by reaffirming their unequivocal desire to arbitrate in the placeholder action. They cite In re Piper Funds, Inc., Institutional Government Income Portfolio Litigation, 71 F.3d 298 (8th Cir. 1995), for the proposition that a formal opt-out is not always necessary. See id. at 304.

However, we find Piper Funds distinguishable from this case. In Piper Funds, the appellant attempted to opt out of the class by formally advising the district court through a letter of its intention and desire to opt out before an opt-out period and procedure had been developed by the court. Although the district court denied that request, the Eighth Circuit reversed, stating that it did not dispute the normal rule forbidding an opt-out until after a Rule 23 notice, but believed that in some cases there must be an exception. It found that the exception applies when a party with an immediate right to arbitrate attempts to opt out before the Rule 23 procedure is initiated but is denied that request. See id. Here Appellants never infor med the District Court of their intention to opt out, neither before nor after the Rule 23 class notice was distributed. Thus, Piper Funds does not advance their argument.

Moreover, numerous courts have held that the mere pendency of an individual litigation or arbitration does not relieve a plaintiff of the obligation to opt out of a class action. See, e.g., In re Prudential Sec. Inc. Ltd. P'ship Litig., 164 F.R.D. 362, 370 (S.D.N.Y. 1996) ("It is well-established that pendency of an individual action does not excuse a class member from filing a valid request for exclusion.") (internal quotations omitted); In r e Prudential-Bache Energy Income P'ship Sec. Litig., No. MDL-0888, 1995 WL 20613, at

*2 (E.D. La. Jan. 6, 1995) (rejecting class member's claim that pending arbitration proceeding was sufficient notice of intent to opt out); Supermarkets Gen. Corp. v. Grinnell Corp., 59 F.R.D. 512, 513 (S.D.N.Y . 1973) ("[T]he existence of [the individual] action did not automatically exclude plaintiffs as potential members of the class. The exclusion could only be effected by compliance with the provisions of Rule 23(c)(2)(B)."). In this context, Appellants cannot succeed in their argument that Cendant's knowledge of the arbitration was sufficient notice for their opting out, and thus Appellants did not opt out of the class impliedly.

\* \* \* \* \*

In sum, Appellants fall within the class definition because they purchased or acquired CUC or Cendant publicly traded securities. The Davidsons wer e not excluded from the class as former officers and directors of pre-merger CUC because the exception only excluded officers and directors of Cendant. Furthermor e, we conclude that Appellants failed to opt out of the class and thus are bound by the class settlement. We therefor e affirm the District Court's finding that Appellants are within the class.

B. Extension of the Opt-Out Deadline

Appellants further allege that the District Court erred in refusing to grant them an extension of time to opt out of the class. They maintain that if they are enjoined from pursuing the arbitration and are found to be within the class definition, they should still not be included as class members because the District Court abused its discr etion in failing to extend the time for them to opt out of the class.

Federal Rule of Civil Procedure 6(b) pr ovides:

> When by these rules or by a notice given ther eunder or by order of court an act is requir ed or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion . . . (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect . . . .

Fed. R. Civ. P. 6(b). The definition of "excusable neglect" recently has been discussed in a related litigation, In re

23

Cendant Corp. Prides Litigation. There, the United States District Court for the District of New Jersey, District Judge Walls (the same District Judge as in this case), stated:

> The Supreme Court has decreed that the determination of whether one party's neglect to adhere to a deadline is excusable should take into account all relevant circumstances surrounding the delay. See Pioneer Invest. Servs. Co. v. Brunswick Assoc. Ltd. Partnership, 507 U.S. 380, 395 (1993). Relevant factors include"the danger of prejudice to the [nonmovant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable contr ol of the movant, and whether the movant acted in good faith." Id. at 395. To this roster, the Third Circuit has added "(1) whether the inadvertence reflected pr ofessional incompetence such as ignorance of the rules of procedure, (2) whether an asserted inadvertence reflects an easily manufactured excuse incapable of verification by the court, and, (3) a complete lack of diligence." Dominic v. Hess Oil V.I. Corp., 841 F.2d 513, 517 (3d Cir. 1988).

In re Cendant Corp. Prides Litig., 189 F.R.D. 321, 324 (D.N.J. 1999), aff 'd, 233 F .3d 188, 196–97 (3d Cir. 2000) (alteration in original).

This Court reviews a District Court's findings concerning excusable neglect for abuse of discretion. See Cendant Prides I, 233 F.3d at 189, 197; Jones v. Chemetron Corp., 212 F.3d 199, 205 (3d Cir. 2000); see also In re PaineWebber Ltd. P'ship Litig., 147 F .3d 132, 135 (2d Cir. 1998); Silber v. Mabon, 18 F.3d 1449, 1453 (9th Cir. 1994). An abuse of discretion occurs when the action of the District Court is clearly contrary to reason and not justified by the evidence. See Springfield Crusher , Inc. v. Transcontinental Ins. Co., 372 F.2d 125, 126 (3d Cir. 1967). A District Court also abuses its discretion if it is influenced by erroneous legal conclusions or applies the wrong legal standards. See Cendant Prides I, 233 F .3d at 192 (holding that an abuse of discretion occurs when the District Court's decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law

24

to fact.") (internal quotations omitted); Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000); Hanover Potato Prods., Inc. v. Shalala, 989 F.2d 123, 127 (3d Cir. 1993); see also Corley v. Rosewood Care Ctr., Inc., 142 F.3d 1041, 1052 (7th Cir. 1998). In addition, we have stated that "[a]n abuse of discretion can occur when no r easonable person would adopt the district court's view." Rode v. Dellarciprete, 892 F.2d 1177, 1182 (3d Cir. 1990).

Here the District Court found that Appellants' alleged failure to receive notice did not warrant an extension of the opt-out deadline. See Cendant Sec. Litig., 194 F.R.D. at 165; In re NASDAQ Market-Makers Antitrust Litig., No. 94-3996, 1999 WL 395407, at *2 (S.D.N.Y. June 15, 1999); Gross v. Barnett Banks, Inc., 934 F . Supp. 1340, 1345 (M.D. Fla. 1995) (finding that no extension was warranted where the class notice was sent to a potential class member's old address despite having been advised of the change of address). The District Court found unconvincing Appellants' argument that Cendant had not tr eated them as class members until after the class opt-out deadline had passed. It found that Appellants did not become class members until they failed to opt out before the deadline. Consequently, Cendant had no reason to tr eat Appellants as class members or inform them of their potential class status. Finally, the District Court did not accept Appellants' explanation of their delay as warranting an extension of time to opt out. See Cendant Sec. Litig., 194 F.R.D. at 165.

We hold that the District Court did not abuse its discretion in refusing to allow Appellants an extension of time to opt out of the class. As stated above, we will not find an abuse of discretion unless the decision is clearly contrary to reason and not justified by the evidence or prevailing law. Here the District Court found that Appellants did not meet the excusable neglect standard simply because they allegedly did not receive notice and because Cendant (the defendant) did not infor m potential plaintiffs (Appellants) of their rights and duties. See In re Prudential Ins. Co. of Am. Sales Practices Litig. , 177 F.R.D. 216, 231 (D.N.J. 1997) ("[D]ue process does not require that every class member receive actual notice so long as the court reasonably selected a means likely to apprise

25

interested parties."). The District Court pointed to the individually mailed notice, the published notice, and the press coverage that the initiation of the class action and the proposed settlement received in holding that Appellants should have been aware of the class action and the potential it had to affect their inter ests. See Cendant Sec. Litig., 194 F.R.D. at 165.

In addition to the District Court's reasoning, Appellants do not qualify for the excusable neglect exception because their actions cause prejudice to Cendant and may not comport with the good faith requirement. 18 See Cendant Prides I, 233 F.3d at 195. While Appellants argue that

_____

18. The dissent argues that "the majority's attempt to cure the deficiencies of the District Court's analysis[is in]consistent with our jurisprudence which requires the District Court to explain its excusable neglect reasoning." It points out that our most recent articulation of this principle is in In re Orthopedic Bone Scr ew Products Liability Litigation, No. 99-2054, wherein we assert that we " `have imposed a duty of explanation on District Courts when they conduct"excusable neglect" analysis.' " Id. at 13 (quoting Cendant Prides I, 233 F.3d at 196). From these statements the dissent makes the leap of logic that the duty to explain the rationale for excusable neglect deter minations means that all Pioneer factors must be explicitly consider ed by the District Court. While a consideration of all relevant Pioneer factors is optimal, this best practice is not our law. Our law is that " `it is a salutary practice [for a court] to give the litigants, either orally or in writing, at least a minimum articulation of the reasons for its decision.' " Orthopedic Bone Screw, No. 99-2054, at 13 (quoting Interpace Corp. v. City of Philadelphia, 438 F.2d 401, 404 (3d Cir. 1971)). What the District Court did in this case, unlike in Orthopedic Bone Screw in which no explanation was given, meets the minimum articulation threshold.

The dissent then castigates our opinion for noting additional reasons not to find excusable neglect in this appeal. Y et we are merely following precisely what we did in one of the Cendant opinions the dissent cites to support its position. In Cendant Prides II, 235 F.3d 176 (3d Cir. 2000), this Court, after holding that the District Court abused its discretion by failing to analyze the Pioneer excusable neglect factors, went on to analyze those factors, including prejudice and bad faith, the same factors the dissent finds us in error for analyzing. After determining that any delay or neglect on the part of appellant was excusable neglect, the Cendant Prides II Court remanded "solely for inclusion in settlement

proceedings," not for analysis of the excusable neglect factors, as the dissent seems to imply is required. See id. at 182, 183-84.

Cendant will not be prejudiced by excluding them from the class because Cendant knew of their claims befor e it reached the class settlement, their argument is unpersuasive. Reliance by Appellants on Mars Steel Corp. v. Continental Illinois National Bank & Trust Co. of Chicago, 120 F.R.D. 51 (N.D. Ill. 1988), In r e Del-Val Financial Corp. Securities Litigation, 154 F.R.D. 95 (S.D.N.Y. 1994), and Dominic v. Hess Oil V.I. Corp., 841 F .2d 513 (3d Cir. 1988), is unavailing, as those cases are easily distinguishable on the prejudice issue. In Mars Steel, the court granted an extension of time to opt out because the defendant did not even argue that it would suffer pr ejudice. See Mars Steel, 120 F.R.D. at 53. Similarly, in Del-V al, the court extended the time to opt out of the class action because the party seeking exclusion intended to proceed with arbitration against a non-settling defendant, and therefor e the settling defendant would not be prejudiced by the extension. See Del-Val, 154 F.R.D. at 97 n.2. Finally, Dominic did not even involve a class action. In that individual pr oducts liability action, the District Court granted plaintiff an extension of

_____

The dissent argues as pungently as possible that the procedural posture of the Cendant Prides II case makes its excusable neglect analysis unavailable for support by the majority her e in analyzing whether the District Court correctly denied Appellants' motion to extend the time for them to opt out of the class. Cendant Prides II made a de novo determination with respect to the excusable neglect factors not applied by the District Court in that case afterfinding that the District Court abused its discretion by failing to apply the Pioneer factors in denying the late filing of a proof of claim in a class action. Cendant Prides II, 235 F.3d at 183. Here we conclude that the District Court did not abuse its discretion in denying the motion to extend the time for Appellants to opt out of the class. In so doing, we apply the same standard of review (abuse of discr etion) as our Court applied in Cendant Prides II. While we also discuss other Pioneer factors supporting our affirmance, this discussion is not necessary to our decision to affirm. But in Cendant Prides II the analysis of Pioneer factors was necessary to the decision and thus required de novo consideration.

In this context, we find the dissent's characterization of our excusable neglect analysis as "[in]consistent with[this Court's] jurisprudence" to be
unsupported. Moreover, for the dissent to conclude that a duty of explanation meeting a minimum articulation thr eshold equals full blown articulation is fallacious.

27

time to serve notice and the complaint on a thir d party defendant who was already subject to personal jurisdiction of the court. See Dominic, 841 F.2d at 516. This Court affirmed, finding no prejudice to the third-party defendant because it was already a party to the suit and knew of all the claims and specific allegations.

Here Cendant, the settling defendant, would clearly be prejudiced by a finding that Appellants ar e not within the class. Appellants' substantial holdings could subject Cendant to additional liabilities for the accounting fraud allegations that they settled in the class action vis-a-vis all eligible persons who did not opt out of the class. Permitting Appellants to opt out now will deprive Cendant of the finality it sought in settling the class action, r egardless whether the March 24, 2000 letter from Appellants' counsel, see infra note 21, put it on notice of Appellants' claims and specific allegations before the District Court formally approved the settlement.19 Cf. Prudential Sales Practices Litig., 164 F.R.D. at 371-72 ("Defendants would be loath to offer substantial sums of money in compromise settlements of class actions unless they can r ely on the notice provision of Rule 23 to bind class members.").

Finally, it is plausible to argue that Appellants do not meet the excusable neglect standard because the record draws into question whether they may have failed to comport with the good faith requirement. See Mars Steel, 120 F.R.D. at 52 (holding that a party's tar diness designed to gain a tactical advantage violates the good faith requirement). Appellants, in their brief to this Court, claim that "[t]hey did not wait strategically to see what kind of settlement was proposed before communicating their intent to arbitrate their claims." Yet it is possible to infer they did

_____

19. One could argue that because Cendant pr oposed a settlement before the opt-out period passed it could not have known whether Appellants later would opt out. While it is true that Cendant proposed a settlement on December 7, 1999, three weeks before the final opt-out date, December 27, 1999, that settlement was not appr oved until March 29, 2000, three months after the final opt-out date. Therefore, because the Appellants did not opt out, it is fair to say that Cendant was bargaining for finality as to the Appellants' claims when its settlement was approved.

just that, seemingly seeking a strategic advantage in not filing a formal opt-out, and in the timing of their motion for clarification of the class or in the alter native for an extension of time to opt out of the class.

From the time of the initial disclosure of the accounting irregularities through the present, Appellants have acted with abundant caution. First, they filed a placeholder suit in the California Central District to ensur e that they complied with the statute of limitations in the event that the Ninth Circuit ruled against them (thus for eclosing their opportunity to arbitrate). In addition, Appellantsfiled objections to the Class Action Settlement and Plan of Allocation, just in case this Court, as we have, determines that they are class members subject to the ter ms of the settlement.[20] However, even though they were aware of the existence of the class action before the opt-out date passed, Appellants never filed a protective opt-out to ensure that their claims would be arbitrated. With sophisticated investors such as the Davidsons, who were assisted by exceptional counsel, it is not a leap of faith to make the logical inference that their failure tofile a formal opt-out was a strategic decision.

Additionally, as previously mentioned, the opt-out period closed on December 27, 1999. Appellants contend in their brief to this Court that they learned in February 2000 that Cendant considered them class members. Y et, they took no court action until after they received the Plan of Allocation mailed on April 7, 2000.[21] Only after they discovered that their recovery under the Class Action Settlement was significantly less than expected did they file, on April 27, 2000, a motion for clarification of the class definition, or in the alternative for an extension of time to opt out of the class. This tardiness again points to Appellants attempting to gain a tactical advantage and counsels against extending the opt-out period.

_____

20. That case is currently pending befor e this Court, No. 00-2709.
21. While Appellants' counsel did send Cendant's counsel a letter on March 24, 2000, indicating that Appellants did not consider themselves to be part of the class, they took no formal action to ensure this position
until three weeks after the Class Administrator provided them with the Plan of Allocation.

As a result, we find that the District Court did not abuse its discretion in refusing to grant Appellants an extension of time to opt out. We agree with the District Court that Appellants did not qualify for the excusable neglect exception and therefore affirm its holding.

## C. Enjoining of the California Arbitration

Finally, Appellants and the dissent argue that the District Court erred in enjoining the ongoing California arbitration. They specifically contend that it violated the FAA by enjoining the arbitration mandated by the California Central District as well as several agreements among the Appellants, DAI, and CUC/Cendant calling for, inter alia, arbitration of disputes.[22]

_____

22. Conversely, Appellants and the dissent argue that the District Court should have been res judicata bound by the decision of the California Central District with respect to its decision to deny Cendant's motion to enjoin the arbitration. In other words, they allege that the District Court should have given preclusive effect to the California Central District's decision that the Appellants' claims were arbitrable and, under the doctrine of res judicata, referred their claims back to arbitration in California. The fatal flaw of this contention is acknowledged by the dissent. The parties before the California Central District Court did not brief, and that Court in its three and one-half page decision did not mention, whether any of the Appellants were putative class members. Without even acknowledgment of the class action, it is spurious to suggest that res judicata precludes the District Court from deciding whether Appellants' claims could be decided in the class action, i.e., whether they were class members. See Hopewell Township Citizens I-95 Comm. v. Volpe, 482 F.2d 376, 381 (3d Cir. 1973) (finding res judicata does not apply where "at least much of the subject matter of the present lawsuit has not been and could not have been argued in the previous actions"); see also Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd., 99 F.3d 746, 756 (5th Cir. 1996) (holding that res judicata did not apply on the basis that it "is axiomatic that a claim that has not yet accrued is not ripe for adjudication, and hence it is not a claim that `could have been litigated' in a previous lawsuit").

Here the California Central District "was not, and could not have been, presented with -- and thus did not, and could not, decide -- the issue of whether the Davidsons and the Trusts are Class Members." The California Central District issued its order on April 14, 1999, over eight months before the final opt-out date for the class action in New Jersey

30

The District Court's authority to enter such an injunction derives from the All Writs Act, 28 U.S.C. S 1651. Under that Act, "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agr eeable to the usages and principles of law." When a federal court has jurisdiction over a case, the All Writs Act grants it ancillary jurisdiction to issue all writs "necessary or appropriate in aid of " that jurisdiction. See In r e Baldwin–United Corp., 770 F.2d 328, 335 (2d Cir. 1985). Ther e is an analogous provision in the Anti-Injunction Act. 28 U.S.C.S 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.").

The power given to federal courts under the All W rits Act and the Anti-Injunction Act allows them to enjoin state court proceedings when necessary to protect federal court judgments. See Kelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 985 F.2d 1067, 1068–69 (11th Cir. 1993). "Such `federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case.' " Baldwin–United, 770 F .2d at 335 (quoting Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281, 295 (1970)). In class actions, this power allows federal courts to protect settlement efforts and to prevent "inconsistent and inequitable results." In re Joint E. & S. Dist. Asbestos Litig., 134 F.R.D. 32, 38 (S.D.N.Y. 1990). Further, "the All–Writs Act per mits courts to certify a national class action and to stay pending federal and state cases brought on behalf of class members." Id. at 37.

_____

-- December 27, 1999. Consequently, at the time the California Central District issued its ruling, Appellants were no more than potential class members, with every right to opt out of the class to pursue their arbitration claims. Cendant could not have asked the California Central District to declare Appellants class members given their unilateral right to opt out of the class up until December 27, 1999. Because the issue of whether Appellants were class members could not have been argued in the previous action, res judicata is inapplicable.

31

The All Writs Act and the Anti-Injunction Act also give the federal courts the power to enjoin arbitrations. See Kelly, 985 F.2d at 1069; PaineW ebber P'ship Litig., 1996 WL 374162, at *4 ("[A] Court may enjoin arbitration -- even before judgment has been entered in this action -- where that injunction would be `in aid of its jurisdiction' within the terms of the Baldwin-United line of cases."). The District Court, in finding that it had the authority to enjoin the continued prosecution of class members' claims, relied on PaineWebber for the proposition that a district court has the ability to enjoin an ongoing arbitration in or der to give effect to a class settlement. See PaineW ebber, 1996 WL 374162. In that case, the court denied fifteen plaintiffs' attempts to arbitrate claims covered by a class action where they all failed to opt out of the class befor e the deadline. See id. at *4-5.

We agree that, notwithstanding the federal courts' power to enjoin other proceedings, there ar e strong policies that support giving effect to agreements to arbitrate. "The FAA was enacted to reverse centuries of judicial hostility to arbitration agreements by placing arbitration agreements upon the same footing as other contracts." Pritzker v. Merrill Lynch, Fenner & Smith, Inc., 7 F.3d 1110, 1113 (3d Cir. 1993) (internal quotations omitted). Put another way, the FAA seeks "to assure those who desir ed arbitration and whose contracts related to interstate commer ce that their expectations would not be undermined by federal judges." Southland Corp. v. Keating, 465 U.S. 1, 13 (1984). In particular, our Court recognizes that "federal law presumptively favors the enforcement of arbitration agreements." Harris v. Green T ree Fin. Corp., 183 F.3d 173, 178 (3d Cir. 1999).

We also recognize that the Supreme Court requires that arbitrable claims be arbitrated, "even wher e the result would be the possible inefficient maintenance of separate proceedings in different forums." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217 (1985); accord Piper Funds, 71 F.3d at 303. In fact, the FAA "r equires piecemeal resolution when necessary to give effect to an arbitration agreement." Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 20 (1983) (emphasis omitted). Securities lawsuits

32

often may require bifurcated pr oceedings in order to give effect to arbitration agreements. See Dean Witter, 470 U.S. at 218 n.5.

In the same vein, the mere existence of a parallel proceeding that seeks to adjudicate the same in personam cause of action does not in itself provide sufficient grounds for an injunction against a state action or arbitration in favor of a pending federal action. See Carlough v. Amchem Prods., Inc., 10 F.3d 189, 202 (3d Cir. 1993); see also Baldwin–United, 770 F.2d at 336 (citing Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 642 (1977) ("We have never viewed parallel in personam actions as inter fering with the jurisdiction of either court.")); PaineW ebber, 1996 WL 374162, at *3. Even actions derived from the same cause against the same defendants may be maintained simultaneously in federal and state courts. See Carlough, 10 F.3d at 202; see also Westinghouse Elec. Corp. v. Newman & Holtzinger, P.C., 992 F .2d 932, 937 (9th Cir. 1993) (refusing to apply the All Writs Act because the state complaint alleged a contract breach independent of the District Court's protective order, and thus the state court adjudication would not affect interpretation or enforcement of the order). "Any doubts as to the pr opriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion . . . ." Atlantic Coast Line R.R., 398 U.S. at 297.

Moreover, an injunction may only be issued under the Anti-Injunction Act when there is a "r eal or potential conflict [that] threatens the very authority of the federal court." Vernitron Corp. v. Benjamin, 440 F.2d 105, 108 (2d Cir. 1971). For an injunction to be "necessary . . . in aid of . . . jurisdiction" "it is not enough that the requested injunction is related to that jurisdiction, but it must be necessary in aid of that jurisdiction." Carlough, 10 F.3d at 202 (internal quotations and emphasis omitted). That is, an injunction will only be "necessary" "to pr event a state court [or arbitrator] from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." Id.

33

Yet a class action calls for distinct rules in connection with the need to have as many common issues as possible disposed of in a single proceeding. See Coopers & Lybrand v. Livesay, 437 U.S. 463, 470 (1978) ("Ther e are special rules relating to class actions and, to that extent, they are a special kind of litigation."); Henry v. City of Detroit Manpower Dept., 763 F.2d 757, 763 (6th Cir. 1985) (same); Avila v. Van Ru Credit Corp., No. 94-c-3234, 1995 WL 41425, at * 9 (N.D. Ill. Jan. 31, 1995) ("[C]lass actions involve complex litigation and special rules."); Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co. , 98 F.R.D. 254, 271 (D. Del. 1983) ("[C]ommon issues should be resolved in one class proceeding."); Fed. R. Civ. P. 23 (b)(3) (stating that a class action is maintainable when"questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy"). For example, in multidistrict class actions consolidated in a single district court, sound authority exists to enjoin other parties, even states, from bringing actions that would affect the rights of any plaintiffs or class members. In Baldwin-United, the Second Circuit found that the existence of multiple and harassing state actions could only frustrate the district court's effort to craft a settlement because the success of any federal settlement depended on the parties agreeing to release "any and all related civil claims the plaintif fs had against the settling defendants based on the same facts." See Baldwin-United, 770 F.2d at 337. The court concluded "that the existence of actions in state court would jeopar dize [the district court's] ability to rule on the settlements, would substantially increase the cost of litigation,[and] would create a risk of conflicting results . .. . Under the circumstances we conclude that the injunction .. . was unquestionably `necessary or appropriate in aid of ' the federal court's jurisdiction." Id. at 333, 338. Similarly, in Asbestos Litigation, the court's injunction was necessary to implement the settlement covering "all pr esent and future persons injured by asbestos-containing pr oducts." Asbestos Litig., 134 F.R.D. at 38.

34

In deciding whether to enter the injunction that Cendant sought enjoining the California arbitration, the District Court here had to reconcile two seemingly conflicting lines of authority and policies: the one giving it authority to issue all orders to maintain and preserve its jurisdiction over the consolidated multidistrict litigation cases in this Cendant group of actions, and the public policy favoring giving effect to arbitration agreements such as those enter ed between Cendant and Appellants.

Appellants and the dissent rely on the Eighth Circuit's decision in Piper Funds, 71 F.3d 298, in support of their argument that the District Court violated the FAA by enjoining the California arbitration. Despite their assertions to the contrary, Piper Funds is of little help to Appellants. Although the Eighth Circuit did find that the district court there should not have enjoined the arbitration, it did so under circumstances far different fr om ours. It found that because the appellant clearly, in writing, expr essed its desire to opt out of a class before the class notice and opt-out procedure were even developed, the injunction violated the FAA and appellant's immediate right to arbitrate by enjoining the arbitration pending a formal opt-out. See Piper Funds, 71 F.3d at 303-04; see also VMS Sec. Litig, 21 F.3d 139, 141-42 (7th Cir. 1994) (holding that where class members had not opted out of class action, they wer e bound by class action settlement which released their claims against the defendant even though they had obtained an award in the arbitration filed before resolution of the class action).

In Piper Funds, the Eighth Circuit stated:

> [P]roper regard for the F AA required that the court promptly take one of three actions: it could stay the class action while [the potential class member's] claim is arbitrated; it could deny the request to opt out (for example, because [the potential class member's] arbitration claim is not arbitrable or its r equest to opt out was too late); or it could grant the r equest to opt out.

71 F.3d at 304 (emphasis added). Its acknowledgment that proper regard for the FAA allows a court to deny a request

35

to opt out, because that request came too late, concedes the merits of the situation we have here, a point the dissent glosses over. Where a party who desir es arbitration fails timely to opt out of the class, the FAA does not preclude a district court from denying a class member's r equest to pursue arbitration. Thus, Piper Funds is, by its own words, unavailing where Appellants fail to opt out of the class. See PaineWebber, 1996 WL 374162, at *5 (finding that case inapposite to Piper Funds where the plaintiffs did not immediately express their position that they would opt out but instead waited until after the opt-out deadline had passed); Prudential P'ship Litig., 158 F .R.D. at 304 ("Class members who wish to opt out in order to . . . seek arbitration in a forum in existence at the time of the original opt-out deadline have no excuse for their neglect to opt out; they are simply seeking to escape consequences known to them at the time they chose to remain in the class.").

Appellants and the dissent cite no case law holding that the FAA trumps, and thereby forgives, Appellants' failure to opt out. This presages that the District Court did not violate the policies of the FAA when it enjoined Appellants from proceeding with their arbitration after they did not opt out of the class. See, e.g., VMS Sec. Litig., 21 F.3d at 141-42.

As for the enjoining of the California arbitration in its entirety, we review the terms of an injunction for abuse of discretion. John F. Harkins Co. v. W aldinger Corp., 796 F.2d 657, 658 (3d Cir. 1986). Any finding that is a prerequisite to the issuance of an injunction (here whether Appellants were subject to the class action, e.g., were members of the class and were properly denied an extension of time to opt out) is reviewed according to the standar d applicable to that particular determination, and we willfind an abuse of discretion vis-a-vis the injunction if the District Court's prerequisite finding was in error under the applicable standard of review. See id.

We note, however, that the District Court could enjoin only claims in arbitration that were resolved by the Class Action Settlement. Conversely, the District Court could not enjoin the arbitration with respect to any claims that were

not covered by the Class Action Settlement. In its June 20, 2000 Order, the District Court granted Cendant's cross-motion to enforce the March 29, 2000 injunction against continued prosecution by Appellants of their arbitration proceeding against Cendant. To the extent that their prior agreements to arbitrate covered claims not disposed of or released in the Class Action Settlement, the District Court was without the authority to enjoin those pr oceedings because its action was not "necessary or appr opriate in aid of [its] . . . jurisdiction." The arbitration of issues outside the scope of the class action, e.g., possibly the 1.6 million stock options that Cendant concedes were beyond the scope of the class action, does not interfer e with the District Court's disposition and does not seriously impair its flexibility and authority to decide the class action. Further, arbitration of issues outside the bounds of the class action issues cannot lead to inconsistent and inequitable results, as that arbitration pr esents no "real or potential conflict that threatens the very authority of the federal court." Vernitron Corp., 440 F.2d at 108. These "parallel" actions can be maintained without conflict. See Carlough, 10 F.3d at 202.

Unlike Baldwin-United and Asbestos Litigation, where the proposed settlements called for enjoining all claims, as they would have affected the settlement and pr ovided for inconsistent holdings, the settlement in this case only requires that the class members release claims dealing with "publicly traded securities."23 The arbitration of peripheral claims, possibly including the 1.6 million options, cannot affect the District Court's ability or authority to settle the class claims dealing with publicly traded securities. An injunction preventing the arbitration of those claims is clearly not necessary in aid of the District Court's jurisdiction in the class action. Therefor e, we find the District Court abused its discretion in enjoining, in its entirety, the California arbitration, as it did not have the

_____

23. "Each Class Member shall release all`Released Claims,' which include any and all claims . . . that are based upon, related to, arise from, or are connected with the pur chase, acquisition, sale or disposition
of CUC, HFS, or Cendant publicly-traded securities .. . during the Class Period . . . ."

authority, under the All Writs Act, to enjoin those actions or proceedings that were outside the scope of the class action and could not have had any effect on its flexibility and authority to decide and settle the class action. 24

It must be noted that through this opinion we take no position on whether any issues remain for r esolution in arbitration. It is entirely possible that all of the issues before the arbitrator have been settled and/or released by the class action. We make no determination on this issue because we believe it is for the arbitrator, not the District Court, to determine whether a claim befor e him was decided in the class action. See, e.g., Great Western Mortgage Corp. v. Peacock, 110 F.3d 222, 232 (3d Cir. 1997) ("[A] court compelling arbitration should pr eserve the remaining disputed issues for the arbitrator to decide.").

Respecting the principles of the FAA, as well as the opt-out requirement of class actions, we will allow the California arbitration to proceed, subject to affirmance by the Court of Appeals for the Ninth Circuit, but only to the extent of arbitrating claims that were not settled and released in the class action. We further hold that it is for the arbitrator to determine whether the claims Appellants are pursuing in the California arbitration were disposed of in the Class Action Settlement. To the extent that the claims were not included in the class action, the arbitrator has the power to decide those issues. He is only pr ecluded from deciding any issues that were r esolved (either through a court decision or release of claims) as part of the class action. See PaineWebber, 1996 WL 374162, at *4 ("[T]he Court has the ability to enjoin further litigation by class members involving the subject matter of this class action, pursuant to the reasoning of Baldwin-United  and its progeny.").

_____

24. Strangely, the dissent gives the strong impression that we approve and are not reversing the District Court's order enjoining the arbitration.
As review of this opinion shows, that is misleading. What the dissent really argues is that, in limiting our r eversal to only those issues outside
the scope of the class action, we are not r eversing the District Court enough. In our view, the dissent's position -- that reversal of the injunction is called for as to all issues included as well as not included in the class action -- simply goes too far .

We close with a general comment on the well-crafted dissent of Judge Garth challenging, inter alia , our holding that the District Court can enjoin those claims in the arbitration resolved in the Class Action Settlement. Hyperbole aside, the dissent's theme is implicitly as follows. The FAA trumps the All Writs Act. If arbitration is elected as a means to resolve a dispute, a subsequent injunction, the dissent argues, "can never be appr opriate in a case such as this one." Because arbitration was elected by Appellants the month prior to class certification, and because the California District Court ruled over Cendant's objection that the California arbitration should not be enjoined, the New Jersey District Court in a class action is shorn of the ability to enjoin any aspect of Appellants' claims in that arbitration.

The dissent's theme is counterposed by our theme: Appellants -- who concededly knew of the class action, filed their arbitration complaint after the class action was begun, knew that there was an opt-out r equirement in that action (though they claim not to have received notice of the precise date), and did not request an extension of time to opt out until no less than two months after they learned of the opt-out deadline -- can no longer seek to arbitrate claims already decided in the class action. Appellants (and no one else) controlled whether they wer e in or out of the class. They could have opted out of the class at any time during the opt out period, covering almost a full year after they sought arbitration, but never did so. Had they done so, they could have arbitrated their claims en toto .25

This theme, juxtaposed against that of the dissent, follows a reasoning tailored to the specific facts of each case rather than a certitude generalized to exclude all consideration of when class action determinations prevail over arbitration. We leave for another day that issue. Also not before us is whether the claims of Appellants are enforceable under the FAA. They ar e. But not always! As noted in Piper Funds, in quoting S 12(d) of the National Association of Security Dealers' Code with r espect to

_____

25. Thus, we disclaim the dissent's Rabelaisian r emark that enjoining an arbitration in this case "can never be appr opriate."

39

arbitration as a means of resolving disputes in the securities industry, " `such claims shall be eligible for arbitration . . . pursuant to the parties' contractual agreement, if any, if a claimant demonstrates that it has elected not to participate in the putative or certified class action or, if applicable, has complied with any conditions for withdrawing from the class prescribed by the court.' " Piper Funds, 71 F.3d at 302. Here Appellants failed to demonstrate that they affirmatively elected not to participate in the putative or certified class and did not comply with any conditions for withdrawing fr om that class. They are left with the consequences of their failure to act.

III. Conclusion

For the foregoing reasons, we affir m the District Court's rulings as to the inclusion of Appellants in the class as well as its refusing to grant them an extension of time to opt out. However, we reverse the District Court's enjoining of the entire arbitration and will allow that arbitration to proceed, though only as to issues not r esolved as part of the class action. We further hold that it is for the arbitrator, not the District Court, to determine which, if any, of Appellants' claims are ripe for decision in accordance with this Opinion and the Class Action Settlement.

40

Volume 2 of 2

Filed May 9, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2185

IN RE: CENDANT CORPORATION LITIGATION

JANICE G. DAVIDSON; ROBERT M. DA VIDSON, in his capacity as trustee of Robert M. Davidson Charitable Remainder Unitrust, and as co-trustee of Elizabeth A. Davidson Irrevocable Trust, Emilie A. Davidson Irrevocable Trust, John R. Davidson Irrevocable Trust, Emilie A. Davidson Charitable Remainder Unitrust and John R. Davidson Charitable Remainder Unitrust,
        Appellants

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 98-cv-01664)
District Judge: Honorable William H. W alls

Argued: November 16, 2000

Before: SLOVITER, AMBRO, and GARTH, Circuit Judges

(Filed: May 9, 2001)

GARTH, Circuit Judge, dissenting.

I respectfully dissent from the majority's decision. In particular, and apart from any other doctrine of law, I cannot understand how the majority can permit a New Jersey District Court to enjoin arbitration and thereby overrule an order by a companion district court in California compelling arbitration,1 when that arbitration order was entered months before notice of class certification was even distributed and when that order embraced each and every one of the Davidsons' claims.

This issue of arbitration vis-a-vis class certification is of overriding importance, and its proper r esolution cannot be overemphasized. Indeed, just recently this Court has announced the formation of a Task For ce on selection of class counsel and has enumerated a number of issues for the Task Force to consider.2 I suggest that this question of arbitration-class certification is one which in my opinion should assume prominence in the Task For ce's labors.

I.

I suggest that the sequence in which the majority discusses issues in its opinion is inappropriate and in effect "puts the cart before the horse." I should not be surprised that the discussion of the arbitration injunction issue-- unquestionably the most significant and important in this case and an issue of first impression--was relegated to the very last discussion in an otherwise mundane appeal. Obviously, if one "goes into" the arbitration injunction discussion with a holding that the appellants--the Davidsons--were and are class members, all else falls into the majority's theory. As one goes in, that's how one comes out. That is the tactic employed by the majority her e.

_____

1. The California Central District Court's order, Cendant Corp. v. Davidson, No. 99-0587 (C.D. Cal. April 8, 1999) appears in the appendix at App. 704-09.

2. See, e.g., Cendant Corp. PRIDES Litig., 243 F.3d 721 (3d Cir. 2001), discussing our overall supervisory role and our responsibilities in the selection of class counsel and in attorneys' fee awards as well as in safeguarding fair settlements of class actions.

42

However, if, with an understanding of the r ecord and a correct understanding of the case authority and res judicata, we recognize, as I do, that the opinion and order of the California Central District Court which required Cendant to arbitrate with the Davidsons pr eceded any class certification and also preceded by approximately seven months any distribution of a class notice which pr escribed an opt-out period, then a completely differ ent and a correct result obtains.

Accordingly, the proper course of action for the majority would have been to deal with the arbitration injunction first. If the majority then concluded, as I feel it should have, that the arbitration order both preceded and preempted the class action as to the Davidsons, then the issue of whether the Davidsons fit within the class definition is completely irrelevant because they could not have been class members. As I will discuss later, that is the only and the correct result of this appeal. In light of my conviction that the arbitration issue necessarily had to be decided before the issue of the Davidsons' inclusion in the class, I will discuss the issues in that order.

II.

The majority characterizes its holding with r espect to the New Jersey District Court's injunction of the Davidsons' arbitration as follows: "we hold that the District Court did err in enjoining, in its entirety, Appellants' arbitration. While Appellants are subject to the class settlement, and therefore are enjoined fr om pursuing any claims that fall within that settlement, they are not enjoined from pursuing, in arbitration, any claims that fall outside the settlement's scope." (Maj. Op. at 1 (emphasis added).)

In discussing the arbitration injunction, the majority correctly cites language from the Supr eme Court emphasizing the preferred status of arbitration under the Federal Arbitration Act ("FAA"). (Maj. Op. at 32.) However, because "Appellants . . . cite no case law holding that the FAA trumps, and thereby forgives,[the Davidsons'] failure to opt out," the majority holds that "the District Court did not violate the policies of the FAA when it enjoined

43

Appellants from proceeding with their arbitration after they did not opt out of the class." (Maj. Op. at 36.) Accordingly, the majority concludes that "the District Court could enjoin . . . claims in arbitration that were r esolved by the Class Action Settlement." (Maj. Op. at 36.) The majority could not be more wrong.

Indeed, I strongly disagree with the majority's decision for several reasons. I would hold that the New Jersey District Court did abuse its discretion, indeed it gr ossly abused its discretion, in enjoining the arbitration and not giving effect to the California Central District Court's or der compelling arbitration, and I would hold that the entir e arbitration must be allowed to go forward.

A.

First, the majority wholly ignored the timing of the initiation of the arbitration and of the class action. Because of the importance of the various events, I note in the margin the timeline of these events and the dates on which they occurred.3 Further, I recite the chronology of the most significant events that occurred:

_____

3. Timeline:

December 14, 1998 Lead Plaintiffs file an Amended Consolidated Class Action Complaint ("ACCAC") and move for class certification.
December 17, 1998 The Davidsons initiate arbitration against Cendant pursuant to their Settlement Agreement.
January 21, 1999 Cendant files suit in the District Court for the Central District of California to enjoin the arbitration (claiming that the Davidsons' claims are barred by the Settlement Agreement).
January 27, 1999 The New Jersey District Court grants the motion for class certification.
February 17, 1999 Cendant moves for a pr eliminary injunction of the arbitration; the Davidsons move for summary judgment on the injunction action.
April 8, 1999 The California Central District Court dismisses Cendant's injunction action and finds that the Davidsons' claims must be arbitrated.
April 1999 Cendant appeals the California Central District Court's decision, and Cendant and the Davidsons

44

1) the Amended Consolidated Class Action Complaint and
        motion for class certification were filed on December 14,
        1998;

2) the Davidsons filed a Notice of Claims for arbitration
        against Cendant on December 17, 1998;

3) the class was certified on January 27, 1999;

4) on April 8, 1999, the California Central District Court
        issued an opinion and order declining to enjoin the
        Davidsons' arbitration and finding that the Davidsons'
        claims must be arbitrated;

5) in October 1999, class notice was first  disseminated
        and the opt-out period began (almost a year after the
        Notice of Claims for arbitration was filed);

6) the opt-out period for the class action expir ed on
        December 27, 1999.

The majority ignores the most salient fact--that the
Davidsons initiated arbitration before  the class was certified
--indeed, before any notice of certification was ever
formulated or distributed. Despite this and despite the fact

_____

        agree to stay arbitration pending the Ninth
        Circuit's resolution of the appeal.
August 6, 1999 The New Jersey District Court or ders
        dissemination of class notice.
October 1999 Class notice is disseminated.
December 17, 1999 A proposed settlement of the class action is
        reached.
December 27, 1999 The opt-out period for the class action expires.
March 29, 2000 The New Jersey District Court grants preliminary
        approval of the settlement of the class action.
April 2000 The Davidsons file a motion in the New Jersey
        District Court for clarification of the class to
        exclude them or for extension of the opt-out
        period.
June 20, 2000 The New Jersey District Court enjoins the
        Davidsons' arbitration and finds that they ar e
        class members.
August 15, 2000 The final settlement of the class action is approved
        by the New Jersey District Court and class
        members release all claims against Cendant.

45

that no case authority--I repeat, no case authority--exists
which holds that an arbitration initiated prior to class
certification, thereafter ordered by a federal district court,
and on appeal to its Court of Appeals4  may be enjoined, the
majority here nevertheless and perplexingly holds that the
New Jersey District Court properly enjoined the Davidsons'
arbitration of issues covered by the class action.

B.

The majority states that the District Court had authority
to enjoin the Davidsons' arbitration under the All W rits Act,
28 U.S.C. S 1651.5 The majority goes on, however, to make
several points that contravene its own eventual holding: 1)
that the Supreme Court, and the FAA,"require[ ] that
arbitrable claims be arbitrated" in most cir cumstances; 2)
that federal district courts may only enjoin state court
proceedings and arbitrations under the All W rits Act in rare
instances;6 and 3) that the Anti-Injunction Act, 28 U.S.C.
S 2283, also limits the situations in which injunctions of
other proceedings by federal district courts ar e permissible.
(Maj. Op. at 31-39.) By making these points, the majority
has, in effect, done much of my work for me.

_____

4. The California Central District Court's order of April 8, 1999 is
presently pending before the Ninth Cir cuit.
5. Incidentally, the New Jersey District Court did not explicitly invoke
the
All Writs Act in enjoining the Davidsons' arbitration. I will assume,
however, that the All Writs Act is where the District Court found its
authority to issue the injunction, in light of the lack of such authority
under Rule 23 of the Federal Rules of Civil Pr ocedure itself. As the
Second Circuit observed in In re Baldwin-United Corp. Litig.:

        We do not find independent authority for the issuance of the
        injunction in the Fed.R.Civ.P. 23(d) pr ovision empowering the
        district judge to issue orders appropriate"for the protection of
the
        members of the class or otherwise for the fair conduct of the
action";
        that rule is a rule of procedure and cr eates no substantive rights
or
        remedies enforceable in federal court.

770 F.2d 328, 335 (2d Cir. 1985).

6. We should not lose sight of the fact that, here, a federal district
court
in New Jersey enjoined a California arbitration after a California federal
district court had previously denied Cendant's application to reject the
Davidsons' arbitration claims.

Picking up after the majority's eloquent recitation of these points, one would expect that the majority would logically hold that the District Court's order enjoining the Davidsons' arbitration was without legal foundation and authority and must, therefore, be reversed. Inexplicably, the majority, without basis in reason and without support in the cases and statutes on which it relies, has err oneously held otherwise, leading to this dissent.

1.

The All Writs Act states: "The Supr eme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their r espective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. S 1651(a). To explain why the majority erred in relying on the All Writs Act to support its affirming the District Court's injunction, I will flesh out in more detail the scope of the Act and the meaning of the phrase "necessary7 . . . in aid of . . . jurisdiction[ ]."

In Turner Broadcasting System, Inc. v. Federal Communications Commission, the Supreme Court stated:

> The All Writs Act, 28 U.S.C. S 1651(a), is the only source of this Court's authority to issue an injunction. We have consistently stated, and our own Rules so require, that such power is to be used sparingly. "[J]udicial power to stay an act of Congr ess, like judicial power to hold that act unconstitutional, is an awesome responsibility calling for the utmost circumspection in its exercise. . . .

_____

7. Though the All Writs Act contains the phrase "necessary or appropriate in aid of . . . jurisdiction[ ]," 28 U.S.C. S 1651(a) (emphasis added), the
scope of authority to issue injunctions under the Act is necessarily limited by the Anti-Injunction Act, which pr ovides that "[a] court of the United States may not grant an injunction to stay pr oceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to pr otect or effectuate its judgments." 28 U.S.C. S 2283. Therefor e, the appropriate inquiry under the All Writs Act in conjunction with the Anti-Injunction Act is whether the injunction is "necessary in aid of . . . jurisdiction." (Emphasis added).

47

> An injunction is appropriate only if (1) it is"necessary
> or appropriate in aid of [our] jurisdictio[n]," 28 U.S.C.
> S 1651(a), and (2) the legal rights at issue are
> "indisputably clear."

507 U.S. 1301, 1303 (1993) (internal citations omitted).

In sanctioning the New Jersey District Court's injunction
as authorized under the All Writs Act, the majority
erroneously relies on several cases.8 First, the majority
misapplies In re Baldwin-United Corp. Litig., 770 F.2d 328
(2d Cir. 1985). In Baldwin-United, the district court had
issued an injunction against state court actions under the
All Writs Act, stating that "the injunction was necessary `in
aid of preserving [the court's] jurisdiction.' " 770 F.2d at
333 (quoting 28 U.S.C. S 1651). The district court had
found that "the existence of competitive litigation . . . would
jeopardize its ability to rule on the settlements, would
substantially increase the cost of litigation, would create a
risk of conflicting results, and would pr event the plaintiffs
from benefiting from any settlement alr eady negotiated or
from reaching a new and improved settlement in the federal
court." 770 F.2d at 333.

The Second Circuit affirmed the district court's grant of
a preliminary injunction in Baldwin-United , observing that
an injunction is proper under the All W rits Act when
"necessary to prevent a state court fr om so interfering with
a federal court's consideration or disposition of a case as to
seriously impair the federal court's flexibility and authority
to decide that case." 770 F.2d at 335 (quoting Atlantic Coast

_____

8. The majority also perplexingly contradicts itself in its discussions of
the FAA and the Anti-Injunction Act. It corr ectly observes that "the
Supreme Court requires that arbitrable claims be arbitrated, even where
the result would be the possible inefficient maintenance of separate
proceedings in different forums," and it points out that "the FAA requires
piecemeal resolution when necessary to give ef fect to an arbitration
agreement." (Maj. Op. at 32 (internal citations and quotation marks
omitted).) However, only two pages later , the majority contradicts this
mandate, averring in its discussion of the Anti-Injunction Act that "a
class action calls for distinct rules in connection with the need to have
as many common issues as possible disposed of in a single proceeding."
(Maj. Op. at 34.) This statement is simply incorr ect in the context of
this
case, in light of FAA and Anti-Injunction Act jurisprudence.

Line R.R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 295 (1970) (dicta)). The Second Cir cuit held that this standard was met in Baldwin-United because "[t]he existence of multiple and harassing actions by the states could only serve to frustrate the district court's efforts to craft a settlement in the multidistrict litigation before it [because t]he success of any federal settlement was dependent on the parties' ability to agree to the release of any and all related civil claims the plaintif fs had against the settling defendants based on the same facts," which release would be uncertain "[i]f states or others could derivatively assert the same claims on behalf of the same class or members of it." 770 F.2d at 337.

The holding in Baldwin-United that an injunction was proper under the All Writs Act is wholly inapplicable to this case for several reasons. First, it concer ned derivative lawsuits in state courts by the states themselves, not arbitration by an individual under the FAA. Second, the lawsuits were commenced after the class settlement was reached, contrasted with the Davidsons' arbitration, which was initiated before the CalPERS class was even certified. Finally, whereas the district court in Baldwin-United properly held that the injunction was necessary to preserve its jurisdiction under the All Writs Act because of the dangers to the class settlement from these derivative lawsuits, an injunction of the Davidsons' arbitration is not necessary to the settlement of the claims of the other CalPERS class members because the settlement of the class action here is not at all contingent on the Davidsons' participation in the class action. Moreover , the Davidsons have already received a final judgment in their favor from a competent court--the California Central District Court-- holding their claims to be arbitrable. (I discuss this issue of res judicata hereafter.)

The majority also cites In re PaineW ebber Partnership Litig., 1996 WL 374162 (S.D.N.Y. July 1, 1996), a case that the District Court relied upon in enjoining the arbitration. The majority observes that, in PaineWebber, "the court denied fifteen plaintiffs' attempts to arbitrate claims covered by a class action where they all failed to opt out of the class before the deadline," a situation which the majority apparently likens to the instant case. (Maj. Op. at 32.)

In PaineWebber, after the opt-out period had expired and a tentative settlement had been reached, fifteen class members who had failed to opt out initiated separate state court litigation and arbitration, both covering similar claims to those in the class action. Relying on Baldwin-United, the district court enjoined the state litigation and the arbitration under the All Writs Act, observing that such an injunction was appropriate "where a federal court is on the verge of settling a complex matter, and state court proceedings may undermine its ability to achieve that objective." 1996 WL 374162, at 3 (quoting Standard Microsystems Corp. v. Texas Instruments, Inc., 916 F.2d 58, 60 (2d Cir. 1990). The district court further noted that "this consolidated class action is analogous to a r es over which the Court requires full control, ther eby justifying a stay pursuant to the All Writs and Anti-Injunction Acts, at least to the extent that parties to this litigation seek to bring a new action in a different forum." 1996 WL 374162, at 3.

In fact and in law, PaineWebber is wholly inapposite to this case, and I fail to understand why the majority has relied upon it. In PaineWebber, the plaintiffs did not seek arbitration until after the class had been certified, after notice of the class action had been sent out, after the opt-out period had expired, and after a tentative settlement of the class action had been reached. The observations by the district court in PaineWebber that"the Court has the ability to enjoin further litigation by class members involving the subject matter of this class action," 1996 WL 374162, at 4 (S.D.N.Y. July 1, 1996) (emphasis added), and that an injunction was proper "to the extent that parties to this litigation seek to bring a new action in a different forum," 1996 WL 374162, at 3 (emphasis added), have no r elevance or application here, where the Davidsons' arbitration did not constitute "further litigation" or "a new action" but rather was commenced before class certification and was confirmed as the appropriate course of action by a federal district court in California long befor e class notice was disseminated. Accordingly, the reasoning employed by the district court in PaineWebber to issue an injunction under the All Writs Act cannot be used to justify the injunction here.

50

Another case cited by the majority, In r e Joint Eastern and Southern Districts Asbestos Litig., 134 F.R.D. 32 (E.D.N.Y. 1990), concerned consolidation of asbestos-related proceedings against the defendant. Class counsel and the defendant reached a proposed settlement, after which "the court directed that all inter ested parties appear . . . and show cause why the proposed class should not be certified and asbestos-related proceedings in other forums stayed." 134 F.R.D. at 35. After these hearings, a class action complaint and motion for certification wasfiled, which motion was granted by the court in conjunction with a stay of "any pending asbestos-related pr oceedings brought on behalf of class members." 134 F .R.D. at 35.

In asserting that the injunction in Asbestos was "necessary and appropriate in aid of " the district court's jurisdiction of the class action under the All W rits Act, the district court pointed out that:

> To permit pending actions against [the defendant] to proceed in their present form would substantially impair or impede the interests of other asbestos claimants and would significantly deplete the assets available to resolve all pending and futur e cases. These pending cases, if allowed to continue independently, will seriously hinder the ability of the court to evaluate the adequacy and fairness of the proposed settlement of the class action by constantly depleting [the defendant]'s assets.

134 F.R.D. at 36. In addition, the district court in Asbestos described asbestos litigation as having reached"crisis proportions." Specifically, the district court observed:

> Over 100,000 pending asbestos personal injury and wrongful death cases have backlogged the courts-- preventing many injured persons fr om obtaining much needed compensation in a timely and efficient manner. Even more troubling is the current r ealization that each day, as more judgments are paid, the possibility that similarly situated claimants will not r eceive the full value of their claims becomes increasingly likely. A fundamental tenet of our legal system--equal treatment--no longer exists for asbestos victims.

51

134 F.R.D. at 33.

To suggest that the necessity of enjoining the Davidsons' arbitration is even remotely comparable to the national "crisis" of asbestos litigation is preposterous. The District Court in this case was not faced with hundreds of thousands of individual actions threatening to impair the settlement of the class action before it. Indeed, the District Court was faced with only a single arbitration pr oceeding that had been decided and was on appeal in another Circuit, that had been commenced before class certification pursuant to arbitration agreements between Cendant and the Davidsons, and that made claims available to no other Cendant shareholders. In other words, wher eas the injunction in Asbestos served to stay countless actions by class members, which actions could of course seriously impact the possibility and quality of settlement of the class action, the District Court here enjoined one arbitration arising out of circumstances peculiar to the Davidsons and which could not have any imaginable impact on the administration and disposition of other class members' claims.

The case before us simply does not meet the requirements for issuance of an injunction under the All Writs Act, and none, I repeat, none, of the cases that the majority cites furnishes even a modicum of authority for the conclusion that the majority desires to r each. Unlike Baldwin–United, PaineWebber, and Asbestos, the injunction issued by the New Jersey District Court was not"necessary in aid of its jurisdiction." The Davidsons initiated their arbitration against Cendant under an agreement between the Davidsons and Cendant not applicable to other class members and, as will be discussed infra, the claims in their arbitration overlapped only slightly with the claims in the class action. In addition, there is no thr eat that allowing this arbitration, initiated before class certification and long before expiration of the opt–out period, to pr oceed would expose Cendant to future claims by other putative class members, because such claims would necessarily be commenced much later in the course of the class action and would therefore be more analogous to the cases relied upon by the majority and discussed above.

52

The arbitration would neither "interfer[e] with [the New Jersey District Court's] consideration or disposition" of the class action, nor would it "seriously impair the[New Jersey District Court's] flexibility to decide" the class action, nor would it "undermine [the New Jersey District Court's] ability to achieve" class settlement. Baldwin–United, 770 F.2d 328, 335 (2d Cir. 1985); PaineWebber, 1996 WL 374162, at 3 (S.D.N.Y. July 1, 1996). Accor dingly, I fervently disagree with the majority's holding that the New Jersey District Court had authority to enjoin the arbitration under the All Writs Act.9

2.

Because the Davidsons initiated arbitration so early, indeed before the class had even been certified, those cases cited by the majority which permit injunctions of arbitrations initiated by class members at the time when the class action is nearing settlement are just not applicable to this appeal, and the majority has err ed grievously in attempting to support its holding based on such authority. In light of the fact that the Davidsons commenced arbitration pursuant to unique agr eements

_____

9. The majority cites still another case, In re Prudential Partnership Litig., 158 F.R.D. 301, 304 (S.D.N.Y. 1994), which it claims bolsters its unsupportable conclusion that one district court can enjoin an arbitration that another district court has ruled must go forward. In re Prudential does not invoke the All Writs Act but should be discussed briefly because it too is completely distinguishable from the instant case.
The court in In re Prudential Partnership Litig. stated: "Class members who wish to opt out in order to . . . seek arbitration in a forum in existence at the time of the original opt–out deadline have no excuse for their neglect to opt out; they are simply seeking to escape consequences known to them at the time they chose to remain in the class." 158 F.R.D. 301, 304 (S.D.N.Y. 1994); (See Maj. Op. at 36). By contrast, in this case, the Davidsons did not "wish to opt out in order to . . . seek arbitration." They had already sought arbitration almost a year before the opt-out period even began and over a year before the expiration of the opt-out period and, most importantly, had received a final judgment in their favor. This is not a case in which the Davidsons received notice of the class settlement and then suddenly decided to arbitrate their claims instead of participating in the settlement. Rather , they sought to compel arbitration before the class was even certified.

53

between themselves and Cendant, the majority's holding that the injunction was "necessary . . . in aid of " the District Court's jurisdiction under the All W rits Act is equally untenable. Indeed, the one case wher e the facts are analogous to this appeal, in that the arbitration commenced before the class was certified and notices were distributed, is the Eighth Circuit case of In re Piper Funds, Inc., Inst. Gov't Income Portfolio Litig., 71 F .3d 298 (8th Cir. 1995), a case relying on the FAA rather than the All Writs Act to reverse a district court's injunction of an arbitration initiated before class certification.

In Piper Funds, the Eighth Circuit held that the district court had improperly enjoined an arbitration commenced, as here, before class certification and before the notice of class action had been disseminated and the opt-out period had begun. Piper Funds differs slightly from this case in that the plaintiff in Piper Funds, Park Nicollet, had specifically expressed its desire to opt out of the class before the opt-out period had even begun. The Eighth Circuit pointed out that "the FAA does not authorize a district court to enjoin arbitration" and observed that "there are very few reported cases in which a federal court has enjoined arbitration." 71 F.3d at 302. It listed three reasons why the district court's reasons for the injunction were not sufficient, all of which are equally applicable in this case: 1) "Park Nicollet has a contractual right to immediate submission of its securities law claims to arbitration," 71 F.3d at 303; 2) "Park Nicollet's contractual and statutory right to arbitrate may not be sacrificed on the altar of efficient class action management," 71 F .3d at 303; and 3) the Court did not accept "the class action parties' conclusory assertion that immediate arbitration by Park Nicollet (and perhaps others) will frustrate their class action settlement." 71 F.3d at 303.

Though relying on the FAA to hold that the district court's injunction of the arbitration had been in error, the Eighth Circuit did address the All W rits Act, stating:

> The district court based its injunction on the All W rits Act, 28 U.S.C. S 1651, which has been invoked by federal class action courts to enjoin persons not within the court's jurisdiction from frustrating a court order

54

or court-supervised settlement. We agr ee with the district court that it has the power, under Fed.R.Civ.P. 23 augmented by the All Writs Act, to contr ol conduct by absent class members that affects management or disposition of the class action. However, exercise of this power must be "agreeable to the usages and principles of law," S 1651(a), which in this case include the FAA as well as Rule 23.

71 F.3d at 300 n.2 (internal citations omitted).

To put the Eighth Circuit's holding mor e firmly in the context of the All Writs Act, the FAA's clear preference for arbitration over other forms of litigation dictates that an injunction can never be appropriate in a case such as this one because "the legal rights at issue [can never be] `indisputably clear' " where issuance of an injunction would violate the principles of the FAA, and, ther efore, the second prong of the test of the propriety of an injunction, set forth by the Supreme Court in Turner Br oadcasting System, Inc. v. Federal Communications Commission, can never be met.

It is true that the Court in Piper Funds noted in dictum that the district court may properly have denied the party's request to opt out if, for example, "its r equest to opt out was too late." 71 F.3d at 304. The majority seizes upon that language as reason enough to justify its holding in this case, disregarding the Eighth Circuit's indisputable reasoning that it is inappropriate under the FAA for a district court to enjoin a previously initiated arbitration simply because the party did not follow the standar d opt-out procedure. (See Maj. Op. at 35-36.) However, the majority's willful blindness to the similarities between this case and Piper Funds is just another example of the majority's unwillingness to accept the fact that the arbitration sought by the Davidsons preempted any class membership and could not be enjoined.

In fact, in both this case and Piper Funds, the plaintiffs did not follow the standard opt-out procedure. In Piper Funds, the plaintiff attempted to opt out before the opt-out period had begun, and, here, the Davidsons initiated arbitration well before the opt-out period began but did not explicitly opt out of the class. The Davidsons did not opt

55

out at that time, undoubtedly because neither the Davidsons nor Cendant believed that the Davidsons were class members. Moreover, when the Davidsons filed their motion in the District Court seeking clarification of the class definition, the Lead Plaintiffs filed a brief stating that "Lead Plaintiffs agree that the Davidsons are excluded from the class." (App. 918.) The Davidsons obviously could not have been found to be members of the class if the District Court had honored the California District Court's order compelling arbitration.[10]

Moreover, the majority errs in relying on In re VMS Sec. Litig., 21 F.3d 139 (7th Cir. 1994), to support its point that a late opt-out terminates a party's right to arbitrate. Though, as the majority notes, the plaintiffs in VMS "had obtained an award in the arbitration filed before resolution of the class action," (Maj. Op. at 35), the progression of events in that case differed markedly from this case. In VMS, class actions were filed and consolidated into one class action, and a proposed settlement was approved, subject to notice to class members, hearing, and final approval. Then, the Hubbards initiated arbitration. Subsequently, class notice was disseminated and the opt-out period expired without the Hubbards opting out. The district court then enjoined the Hubbards' arbitration, but the arbitrators heard the Hubbards' claims anyway and granted them an award.

The Seventh Circuit held that "[t]he arbitrators `exceeded their power' when they decided to act on the Hubbards' claims [because t]he Hubbards' claims against Prudential arising from their investment in the VMS Mortgage Investment Fund were subject to the class action settlement, and had already been resolved." VMS, 21 F.3d at 145. Indeed, the claims in VMS had been resolved in the class settlement before the Hubbards even initiated arbitration.

_____

10. Additionally, in Section IV, infra, I discuss the New Jersey District Court's failure to comply with this court's directions in noting that, after the California arbitration had been enjoined, the Davidsons were too late to opt out of the class. The District Court failed to apply the Supreme Court's Pioneer analysis and our instructions in its opinion.

By contrast, the Davidsons' arbitration commenced before the class was even certified. Additionally, the Davidsons initiated arbitration pursuant to br oad and binding arbitration agreements (see Part II.C.2, infra),[11] the predominance of which had already been confirmed by a federal district court in California, wher eas the Hubbards' arbitration was not pursuant to such an agreement.[12] Accordingly, the Seventh Circuit's opinion in VMS understandably contained no reference to the guiding principles of the FAA. Because of these significant differences between VMS and this case, the Seventh Circuit's decision that the Hubbards wer e bound to the class settlement after they failed to opt out has no relevance to the instant case. Indeed, I have no quarrel with the VMS decision and might very well have joined in the VMS holding if that case were befor e me.

By asserting that the Davidsons' right to arbitrate is not extinguished by their failure to opt out of the class, I am not "gloss[ing] over" the Eighth Cir cuit's statement in Piper Funds regarding late opt outs as the majority suggests. (Maj. Op. at 36.) I am simply affording more importance to the Eighth Circuit's actual holdings r egarding the predominance of the FAA than to itsfleeting statement in dictum regarding late opt-outs. The majority, by contrast, has attempted to support and justify its holding her e by resorting to odd and assorted dicta from the cases which it has cited and I have distinguished, all of which, other than Piper Funds, are irrelevant to the issue presented here of arbitration preceding class action. (See  Maj. at 35–36 (quoting In re VMS Sec. Litig., 21 F .3d 139 (7th Cir. 1994); In re PaineWebber P'ship Litig., 1996 WL 374162 (S.D.N.Y. July 1, 1996); In re Prudential P'ship Litig., 158 F.R.D. 301 (S.D.N.Y. 1994).)

I believe, as I have earlier stated, that the only case relevant to the issue before us is Piper Funds, which, while

---

11. Singularly, the majority opinion makes no mention of the terms and breadth of the arbitration agreements entered into by the Davidsons and Cendant in its discussion and analysis.

12. In addition, as will be discussed in Part III infra, the class settlement
here did not "resolve" the Davidsons' claims.

not binding on us in the Third Circuit, nonetheless, with unimpeachable reasoning, supports a holding that, under the FAA, and despite the All Writs Act, the New Jersey District Court could not have and should not have enjoined the Davidsons' arbitration.

C.

1.

The Davidsons argue that the New Jersey District Court should have given res judicata effect to the decision by the California Central District Court. In addr essing this argument by the Davidsons, the New Jersey District Court stated:

> Plaintiffs' assertion that the Court is r es judicata-barred from hearing this action is meritless. The Central District of California was not pr esented with the issue before this Court--whether the Davidsons are within the CalPERS settling class. While the Court directed arbitration of claims arising fr om the 1996 acquisition and 1997 Settlement Agreement, that direction was made under different factual (and procedural) circumstances. As Cendant says, it did not argue that the Davidsons were class members--at most, they were potential members. Obviously, that issue was not before the Central District of California impliedly or actually.

194 F.R.D. 158, 166 (D.N.J. 2000). I believe that the New Jersey District Court incorrectly applied the doctrine of res judicata and that the Davidsons are corr ect that the California Central District Court's decision precluded the New Jersey District Court from enjoining the Davidsons' arbitration.

Initially, I should explain that there ar e two forms of preclusion under the doctrine of res judicata: claim preclusion and issue preclusion (also r eferred to as collateral estoppel). As the Third Circuit stated in In re Graham:

58

> Claim preclusion applies to claims that `wer e or could
> have been raised' in a prior action involving the`parties
> or their privies' when the prior action had been
> resolved by `a final judgment on the merits.' Claim
> preclusion thus bars relitigation of any claim that
> could have been raised in the prior action even if it was
> not so raised.

In re Graham, 973 F.2d 1089, 1093 (3d Cir.1992) (internal
citations omitted). Issue preclusion, on the other hand,
"bars relitigation only of an issue identical to that
adjudicated in the prior action." Witkowski v. Welch, 173
F.3d 192, 198 n.8 (3d Cir. 1999); see also In re Braen, 900
F.2d 621, 628–29 n. 5 (3d Cir.1990).

Here, we are considering Cendant's motion for an
injunction of the arbitration, a motion made in both
California and in New Jersey. The Califor nia Central
District Court dismissed Cendant's action seeking an
injunction, and that decision is currently on appeal before
the Ninth Circuit Court of Appeals.13   The decision of the
California Central District Court constitutes a "final
judgment on the merits" and that the doctrine of claim
preclusion applies to that decision.

The Supreme Court has described the doctrine of claim
preclusion as follows: "A final judgment on the merits of an
action precludes the parties or their privies from relitigating
issues that were or could have been raised in that action."
Federated Department Stores, Inc. v. Moitie, 452 U.S. 394,
398 (1981). Therefore, it must be deter mined whether
Cendant's motion for an injunction of the Davidsons'
arbitration in the New Jersey District Court was"or could
have been raised" in the California Central District Court.

Cendant's complaint before the California Central District
Court asking the court to enjoin the arbitration was based
solely on the several agreements between Cendant and the
Davidsons and did not mention the issue of the Davidsons'

_____

13. Under federal law, a judgment on appeal is still a final judgment for
res judicata purposes. See Huron Holding Corp. v. Lincoln Mine Operating
Co., 312 U.S. 183, 188–89 (1941); Transaero, Inc. v. La Fuerza Aerea
Boliviana, 99 F.3d 538, 540 (2d Cir . 1996).

putative class membership at all. In addition, as the New
Jersey District Court pointed out, the issue of the
Davidsons' class membership could not have been before
the California Central District Court because, at the time of
the California Central District Court's decision, the opt-out
period had not even begun and, therefor e, the Davidsons
had not yet irrevocably failed to opt out of the class action.

The New Jersey District Court found this distinguishing
feature to be dispositive of the res judicata question, as
does the majority here, which describes the fact that the
Davidsons' putative class membership was not addr essed
in the California injunction action as a "fatal flaw." (Maj.
Op. at 30-31 n.22.) Indeed, the New Jersey District Court
reasoned that, because the Davidsons' class membership
"was not before the Central District of California impliedly
or actually," 194 F.R.D. at 166, the California court's
decision that the Davidsons' could not be enjoined did not
preclude the New Jersey District Court fr om enjoining the
arbitration after the expiration of the opt-out period.

However, it is the New Jersey District Court's and the
majority's analyses, not mine, that are fatallyflawed. What
the New Jersey District Court and the majority fail to
realize is that the Davidsons' class membership is irrelevant
to the issue of whether to enjoin the arbitration. Because of
the timing of the arbitration and the class action and
because of the lack of authority to enjoin the Davidsons'
arbitration under the All Writs Act, all discussed in detail in
the preceding sections, the New Jersey District Court could
not base its authority to issue an injunction on the
(arguable) fact of the Davidsons' class membership.
Therefore, contrary to the majority's position, it is far from
"spurious to suggest that res judicata pr ecludes the District
Court from deciding whether Appellants' claims could be
decided in the class action." (Maj. Op. at 30-31 n.22.) The
issue before the New Jersey District Court, whether to
enjoin the Davidsons' arbitration at Cendant's r equest, was
precisely the same issue that was befor e the California
Central District Court and that the California court decided
more than a year before the New Jersey District Court dealt
with the issue. Thus, it is completely irrelevant that
"Cendant's complaint [in the California Central District

60

Court] . . . did not interpose the existence of the class action as a ground for seeking injunctive r elief from the arbitration." (Maj. Op. at 9.)

Because the injunction issues before the California and New Jersey courts were the same, the New Jersey District Court was required to afford the decision of the California court res judicata effect. The Califor nia Central District Court held that, with regard to the Davidsons' claims regarding rescission of the Settlement Agreement, "[t]he Supreme Court has held that an arbitrator must resolve a claim to rescind a contract based upon fraud in the inducement when the contract contains a broad arbitration provision." (App. 705 (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404-05 (1967).) The court also held that the remaining claims, regar ding the merger of CUC and DAI, should also be submitted to arbitration because "whether or not the claims were r eleased depends on whether the settlement agreement can be r escinded, and depends also on the scope of the release in the agreement. Both of these issues must be determined by an arbitrator, pursuant to the clear intent of the parties to submit such disputes to binding arbitration." (App. 706.) This clear holding by the California Central District Court left no room for the New Jersey District Court to enjoin the Davidsons' arbitration, and the New Jersey District Court err ed in doing so. The majority has similarly erred in upholding the New Jersey court's injunction.

2.

It is worth mentioning briefly that a review of the arbitration clauses in the February 19, 1996 Mer ger Agreement and the May 27, 1997 Settlement Agr eement between the Davidsons and Cendant makes clear that the California Central District Court's decision to dismiss Cendant's injunction action and to allow the arbitration to go forward was the correct decision. The arbitration clause in the Merger Agreement states: "Any controversy, dispute or claim arising out of or relating to this Agr eement or the breach hereof which cannot be settled by mutual agreement . . . shall be finally settled by arbitration . . ." (App. 524.) The clause goes on to state that "[t]he decision of the

61

arbitrator on the points in dispute will be final, unappealable and binding and judgment on the awar d may be entered in any court having jurisdiction thereof." (App. 524.) Additionally, the clause states:

> The parties agree that this clause has been included to rapidly and inexpensively resolve any disputes between them with respect to this Agreement, and that this clause shall be grounds for dismissal of any court action commenced by either party with respect to this Agreement, other than post-arbitration actions seeking to enforce an arbitration award.

(App. 524-25 (emphasis added).

The Settlement Agreement contains similar language. The agreement to arbitrate states:

> Notwithstanding anything to the contrary contained in this Agreement or the Surviving Agreements and Rights, any controversy, dispute or claims arising out of or relating to this Agreement or any of the Surviving Agreements and Rights or the breach her eof or thereof which cannot be settled by mutual agreement shall be finally settled by binding arbitration in accor dance with the Federal Arbitration Act . . .

(App. 668.) The arbitration clause in the Settlement Agreement also states that "[t]he decision of the arbitrator on the points in dispute will be final, unappealable and binding, and judgment on the award may be enter ed in any court having jurisdiction thereof." (App. 669.) Finally, as in the Merger Agreement, the arbitration clause in the Settlement Agreement states:

> The parties agree that this Section has been included to rapidly and inexpensively resolve any disputes between them with respect to this Agreement or any of the Surviving Agreements and Rights, and that this Section shall be grounds for dismissal of any court action commenced by any party with respect to this Agreement or any of the Surviving Agr eements and Rights, other than post-arbitration actions seeking to enforce an arbitrator award.

(App. 669-70 (emphasis added).)

62

In their Notice of Claims for arbitration, the Davidsons raised claims in connection with both the Mer ger Agreement and the Settlement Agreement. They explicitly invoked both arbitration clauses in support of arbitrating these claims, stating that "[t]his dispute pr operly is before this arbitration tribunal by virtue of an arbitration provision set forth in the Settlement Agr eement between the Davidsons and CUC," and "[t]his dispute also is properly before this arbitration tribunal by virtue of an arbitration provision set forth in . . . the `Mer ger Agreement.' " (App. 535–36.) The Davidsons also cited similarly wor ded arbitration provisions in their Employment Agr eements with CUC and in their Noncompetition Agreements with CUC in support of arbitrating their claims. (App. 537–38.)

These broad arbitration clauses clearly pr eclude a court from mandating that the Davidsons participate in a class action concerning the claims for which they sought arbitration, and the clauses support the Califor nia Central District Court's decision.

3.

One final point in connection with the preclusive effect of the California Central District Court's decision: in light of the California court's clear holding that the arbitration could not be enjoined, the majority misapplies our decision in Great Western Mortgage Corp. v. Peacock, 110 F.3d 222 (3d Cir. 1997). This court held in Peacock: "Once a dispute is determined to be validly arbitrable, all other issues are to be decided at arbitration. . . . It would be anomalous for a court to decide that a claim should be referr ed to an arbitrator rather than a court, and then, by deciding issues unrelated to the question of forum, for eclose the arbitrator from deciding them." 110 F.3d at 230–31.9

The majority perplexingly fails to realize that the dispute between the Davidsons and Cendant has already been "determined to be validly arbitrable" by the California Central District Court. Accordingly, it is"anomalous" and indeed erroneous for the majority here to issue this opinion which clearly "foreclose[s] the arbitrator from deciding" the very issues raised in the arbitration, which a competent

63

court with jurisdiction over both parties has held to be arbitrable.

D.

Because of the timing of the Davidsons' commencement of the arbitration and the initiation of the class action, because of the fact that the requirements of the All Writs Act were not met in this case for issuance of an injunction, because of this case's dissimilarity to Baldwin-United, PaineWebber, and Asbestos and its similarity to Piper Funds, and because of the appropriate application of the doctrine of res judicata to this case, ther e can be no doubt that the New Jersey District Court grossly abused its discretion in enjoining the Davidsons' arbitration.

Accordingly, I am satisfied that, at this point, the issue of whether the Davidsons can be deemed to fall within the class definition is irrelevant. The Davidsons sought arbitration pursuant to the arbitration clauses in the Merger Agreement and the Settlement Agr eement, and the California Central District Court confir med that arbitration was proper. As noted earlier, that order is presently on appeal to the Court of Appeals for the Ninth Cir cuit and should have been given res judicata effect by the New Jersey District Court. The only way the issue of the Davidsons' class membership could become relevant is if the Ninth Circuit reversed the Califor nia Central District Court's decision and held that the Davidsons' claims were not properly before the arbitrator . Because of that remote possibility, I will nonetheless discuss below the issue of the Davidsons' class membership.

III.

The majority holds that the District Court did not err in finding that the Davidsons were within the class definition. It bases its holding in part on its interpretation of the term "publicly traded" in the class definition, which the majority reads to include the Cendant shares acquir ed by the Davidsons in the Merger Agreement. The majority concedes that there were restrictions placed on the Davidsons' sales of the stock they acquired in the Merger Agreement, but

64

observes that "[t]he restriction on sale of the CUC stock held by Appellants emanated solely from the quantity of shares they received as a result of the merger, not in any way from the type of security they received." (Maj. Op. at 16.)

Further, the majority notes that the r estrictions on the Davidsons' sale of their shares "could be avoided entirely . . . if Appellants were to sell shares of CUC stock under any subsequent registration statement." (Maj. Op. at 17.) Accordingly, the majority reaches the conclusion--a conclusion for which no relevant authority is cited--that the Davidsons' shares were "publicly traded," asserting that "[h]aving traded publicly tens of millions of shares of CUC common stock so soon after the DAI merger , and then to claim that they are not `publicly traded' securities within the class definition, is a non sequitur." (Maj. Op. at 17.)

I cannot agree with the majority's holding on this issue, because the Davidsons' shares were not "publicly traded," and I would hold that the District Court and the majority of this court have erred in holding otherwise.

Pursuant to the Agreement and Plan of Mer ger of DAI and CUC, shares of DAI were to be converted as follows: "each share of common stock, par value $0.00025 per share, of [DAI] issued and outstanding immediately prior to the Effective Time . . . shall, by virtue of the Merger . . . be converted into and shall become 0.85 of one fully paid and nonassessable share of common stock, $.01 par value per share, of [CUC]." (App. 475.) The Agr eement was entered into on February 19, 1996. Also on that date, the Davidsons signed letters upon which the merger was conditioned. The letters stated, inter alia:

> I hereby represent, warrant and covenant to [CUC] that:
>
> (a) I will not transfer, sell or otherwise dispose of any of the [CUC] shares except (i) pursuant to an effective registration statement under the Securities Act, or (ii) as permitted by, and in accordance with, Rule 145, if applicable, or another applicable exemption under the Securities Act; and

65

(b) I will not (i) transfer, sell, or otherwise dispose of any [DAI] Shares prior to the Effective Time (as defined in the Merger Agreement) or (ii) sell or otherwise reduce my risk (within the meaning of the Securities and Exchange Commission's Financial Reporting Release No. 1, "Codification of Financial Reporting Policies," Section 201.01 [47 F.R. 21028] (May 17, 1982) with respect to any [CUC] shares until after such time (the "Delivery Time") as consolidated financial statements which reflect at least 30 days of post-mer ger combined operations of [CUC] and [DAI] have been published by [CUC], except as permitted by Staf f Accounting Bulletin No. 76 issued by the Securities and Exchange Commission.

(App. 1129, 1131.)

In light of these limitations on the Davidsons' shar es, the District Court clearly erred in finding that they were "publicly traded," and the majority compounded that error by subscribing to the District Court's ruling. The Davidsons' shares were certainly "common stock," but not all common stock is necessarily "publicly traded." The Merger Agreement placed restrictions on the Davidsons' trading of their CUC shares, differ entiating them from freely and publicly traded CUC common stock. Further , there is no basis for the majority's speculative assertion that the restrictions were entered into because of the quantity, and not the quality, of the shares. Regardless of the reason, there were restrictions on the Davidsons' shares of CUC common stock, and, therefore, those shar es were not "publicly traded."

Nor am I convinced by the majority's argument that the Davidsons could have avoided the restrictions on their shares by selling under subsequent registration statements. The fact that the Davidsons were able to over come the restriction on their shares (in other wor ds, that the restriction did not amount to an absolute pr ohibition on trading) does not suddenly transform the r estricted shares which are not publicly traded into "publicly traded securities." Whether the restriction made the Davidsons' shares wholly untradeable or tradeable only after some

66

maneuvering, the fact remains that the shar es simply were not "publicly traded securities."

I agree with the majority that the Davidsons meet the class definition in other respects, because they "purchased or otherwise acquired" their shares within the relevant time period, they were "injured ther eby," and they are not "officers and directors of Cendant." However, the dispositive point, and the point on which I diverge fr om the majority, is the majority's position that the Davidsons' shar es are "publicly traded securities." "Publicly traded securities" is the cornerstone of "class membership" as the class was certified. Because the Davidsons' shares wer e not "publicly traded," they do not meet the class definition. Accordingly, the District Court erred in finding the Davidsons to be class members, even according "particular defer ence" to the District Court on this finding.14

_____

14. The majority uses the "particular defer ence" standard of review in referring to the District Court's interpr etations of the District Court's own orders. I do not think that it is appr opriate to accord the District Court "particular deference" on this issue because I do not believe that the District Court's finding as to the Davidsons' membership in the class amounted to an "interpretation of its own or der." The majority asserts that, "[h]ere, the District Court, in determining whether Appellants were class members, interpreted its own orders, the order certifying the class and the order approving the class notice, both of which contained the class definition." (Maj. Op. at 14–15.) In so holding, the majority accords
a "particular deference" to the District Court's interpretations.

While it is true that those orders gave content to the class definition, the District Court did not draft the definition itself. I believe that "particular deference" can be accor ded when the District Court claims to have a better insight on the meaning of an or der as the author of that order. This is not such a case.

Indeed, I believe that the orders in this case approving class certification and approving class notice ar e analogous to consent decrees approved by courts, in that they are "hybrid[s] of . . . contract[s] and . . .
court order[s]." Holland v. New Jersey Dept. of Corrections, Nos. 00–1801, 2356, 2357, at 20. As this court has just recently held in Holland, the appropriate standard of review for such decrees is plenary or de novo review, and not the "particular defer ence" review held by the majority. Holland, at 21–24. Hence, the majority exer cised an incorrect standard of review over the District Court's orders certifying the class and approving class notice.

67

My interpretation of "publicly traded" as not including the Davidsons' shares is bolstered by the definition of "publicly traded" in the Internal Revenue Code Regulations. Regulation S 1.170A-13 defines "publicly traded securities" as follows:

> In general. Except as provided in paragraph (c)(7)(xi)(C) of this section, the term `publicly traded securities' means securities . . . for which (as of the date of contribution) market quotations are readily available on an established securities market.

I.R.C. Reg. S 1.170A-13(c)(7)(xi)(A). The exceptions section states:

> Exception. Securities described in paragraph (c)(7)(xi) (A) or (B) of this section shall not be consider ed publicly traded securities if-- (1) The securities are subject to any restrictions that materially af fect the value of the securities to the donor or pr event the securities from being freely traded . . . .

I.R.C. Reg. S 1.170A-13(c)(7)(xi)(C)(1) (emphasis added).

The Davidsons' shares precisely fall into this exception, in that restrictions were placed on the shares that prevented them from being freely traded. Therefore, according to the definition of "publicly traded" in the Internal Revenue Code Regulations, the Davidsons' shares were not "publicly traded."

Moreover, the majority once again tur ns a blind eye to the Amended and Consolidated Class Action Complaint ("ACCAC"), which by its terms supports the Davidsons' position that the class action was not intended to cover their claims. The ACCAC describes the class members"as purchasers on the [NYSE] and acquir ers pursuant to the Registration Statement and the Joint Proxy Statement/Prospectus [of the merger of CUC and HFS]." (App. 156.) In addition, the ACCAC states:

> Lead Plaintiffs' claims are typical of the members of the Class. Plaintiffs and all other members of the Class acquired their CUC common stock pursuant to the Registration Statement and Joint Proxy Statement/Prospectus, and purchased their CUC and

> Cendant publicly traded securities on the open market and sustained damages as a result of defendants' wrongful conduct complained of herein.

(App. 156.) These statements make clear that the lead plaintiffs intended the class to consist only of purchasers of the Cendant shares on the market and pur chasers pursuant to the HFS/CUC merger. The Davidsons fall into neither of these categories.

In addition, the fact that the claims in the ACCAC for the most part differ from the Davidsons' claims against Cendant lends still further support to excluding the Davidsons from the class. Of the fourteen counts in the ACCAC, only five cover the time period during which the Davidsons acquired their shares. In addition, as the Davidsons point out, the ACCAC alleges claims for violation of Section 11 of the Securities Act, 15 U.S.C. S 77k, only in connection with the HFS/CUC merger. The Davidsons would (and did) pursue such claims on their own behalf in arbitration, but the ACCAC does not make those claims for the Davidsons.[15] The ACCAC only intended to cover merger–related claims in connection with the HFS/CUC merger and further reinforces the point that the CalPERS class did not include the Davidsons.[16]

I therefore disagree with the majority's holding regarding the Davidsons' class membership, because I am convinced that the District Court clearly erred in finding that the Davidsons are within the class.

_____

15. In their Notice of Claims for arbitration, the Davidsons made claims under SS 11, 12(a)(2), and 17 of the Securities Act, 15 U.S.C. S 77a, et seq., S 10(b) of the Securities and Exchange Act, 15 U.S.C. S 78j(b), as well as under various sections of the Califor nia Corporations Law and common law. The ACCAC also alleges violations of sections 11 and 12 of the Securities Act and S 10(b) of the Securities and Exchange Act, but its section 11 and section 12 claims are not the same claims that the Davidsons have asserted in arbitration, and only theS 10(b) claims in the ACCAC arguably cover claims of the Davidsons.

16. See note 4, supra.

IV.

I have still another disagreement with the majority opinion and its holdings. The majority holds that the District Court did not abuse its discretion in its analysis of whether to grant the Davidsons' request for an extension of the time to opt out. In considering the Davidsons's request for an extension of the opt-out deadline under Rule 6(b) of the Federal Rules of Civil Procedure, the District Court described the factors to be considered in connection with the excusable neglect standard in detail, citing the Supreme Court's decision in Pioneer Investment Services Co. v. Brunswick Assoc. Ltd. Partnership, 507 U.S. 380, 395 (1993), and the Third Circuit's earlier opinion concerning this standard, Dominic v. Hess Oil V .I. Corp., 841 F.2d 513, 517 (3d Cir. 1988). See In re Cendant Corp. Sec. Litig., 194 F.R.D. 158, 165 (D.N.J. 2000).

However, the District Court in this case, as in other cases when it gave only lip service to the Pioneer factors, did not comply with the Supreme Court's or our instructions. See In re Cendant Corp. PRIDES Litig., 235 F .3d 176 (3d Cir. 2000); In re Cendant Corp. PRIDES Litig. , 234 F.3d 166 (3d Cir. 2000).17 The District Court here stated only that the Davidsons' "alleged failure to receive notice . . . does not warrant an extension of the exclusion deadline." 194 F.R.D. at 165. It gave as its reasons: class notice was adequately published; the case got independent press coverage; "the Davidsons' assertion that their failure to opt out is excusable because Cendant acted as though they wer e not

_____

17. The majority cites another Cendant appeal in which we affirmed the District Court's decision that certain plaintif fs' late filing of proofs of claim was "excusable neglect." (Maj. Op. at 28 (citing In re Cendant Corp. PRIDES Litig., 233 F.3d 188 (3d Cir . 2000)).) Because that appeal concerned a situation in which the District Court had found excusable neglect, it does not particularly illuminate our analysis of the District Court's failure to conduct a complete excusable neglect analysis here. Moreover, as I note in the text above, at least two other Cendant cases have been remanded because the same District Court judge who presided over the instant case failed to explain his analysis in those cases as well. See In re Cendant Corp. PRIDES Litig., 235 F.3d 176 (3d Cir. 2000); In re Cendant Corp. PRIDES Litig., 234 F.3d 166 (3d Cir. 2000).

70

class members is not convincing"; and Cendant's"defensive maneuvers" in reaction to the Davidsons' arbitration before the expiration of the opt-out period "are irrelevant." 194 F.R.D. at 165.

The District Court said nothing about "the danger of prejudice" to Cendant if an extension wer e granted, "the length of the delay and its potential impact" on the case, or "whether the defendant acted in good faith," Pioneer, 507 U.S. at 395, nor did the District Court consider"(1) whether the inadvertence reflected professional incompetence such as ignorance of the rules of procedure, (2) whether an asserted inadvertence reflects an easily manufactured excuse incapable of verification by the court, and, (3) a complete lack of diligence." Dominic, 841 F.2d at 517.

It does not suffice for the majority to attempt tofill in the gaping gaps left by the District Court in its aborted Pioneer analysis. Nor is the majority's attempt to cur e the deficiencies of the District Court's analysis consistent with our jurisprudence which requires the District Court to explain its excusable neglect reasoning.

When we direct a district court to take a particular action, it is not only customary but I suggest it is our mandate that the issue or case be retur ned to the district court for compliance with our instructions. See, e.g., In re Orthopedic Bone Screw Prods. Litig. , 2001 WL 377052, at 5 (3d Cir. Apr. 16, 2001). It is the district court's discretion and findings, not our discretion and findings, that are called for in relating the facts found to the principles that we have established. Appellate fact finding and"shortcuts" taken by an appellate court as the majority has taken here are rarely if ever prudential and sage and, unfortunately, such fact finding and shortcuts may lead to misunderstandings in the case sub judice, to say nothing of eroding our established jurisprudence. See Pullman–Standard v. Swint, 456 U.S. 273, 291 (1982) (appellate fact finding); Chalfant v. Wilmington Institute, 574 F.2d 739 (3d Cir. 1978) (same). We have consistently followed the practice of having the district court in the first instance determine whether the factors we have established18 meet

_____

18. Our cases are legion in which we have set forth factors which are to be met and analyzed by evidence in the recor d. See, e.g., Holland v. New

evidentiary requirements. Why now in this case has it become so necessary to turn our backs on established procedures, practices, and our announced jurisprudence by usurping the District Court's role?

As we observed in another Cendant appeal:"In the wake of Pioneer, we have imposed a duty of explanation on District Courts when they conduct `excusable neglect' analysis." In re Cendant Corp. PRIDES Litig., 234 F.3d 166, 171 (3d Cir. 2000). Indeed, in that case, r egarding appellant's motion pursuant to Federal Rule of Civil Procedure 60(b) to excuse its late filing of its proof of claim, we vacated the District Court's finding that ther e was no excusable neglect "because the District Court did not make clear its reasoning and application of the`excusable neglect' factors," and, therefore, "we do not have a sufficient basis to review the District Court's ruling for abuse of discretion." 234 F.3d at 168.

In yet another Cendant case, also concer ning a party's Rule 60(b) motion to allow its late filing of a pr oof of claim, we reversed the District Court's finding that there had not been excusable neglect, pointing out that "the District Court failed to apply properly the standar ds for determining `excusable neglect' outlined in Pioneer." In re Cendant Corp. PRIDES Litig., 235 F.3d 176, 180 (3d Cir . 2000). We held "that the District Court's misapplication of the Pioneer factors in denying Santander's Rule 60(b) motion[was] beyond the sound exercise of its discretion." In re Cendant Corp. PRIDES Litig., 235 F.3d at 184.

Indeed, in a recent opinion, the author of the majority opinion has himself acknowledged our requir ements for

---

Jersey Dept. of Corrections, Nos. 00–1801, 2356, 2357, at 34–43 (findings of fact in connection with enforcement of compliance with consent decrees); Cendant Corp. PRIDES Litig., 243 F.3d 721 (3d Cir. 2001) (awards of attorneys' fees in class actions); Oddi v. Ford Motor Co., 234 F.3d 136 (3d Cir. 2000) (deciding whether to conduct Daubert hearings); In re TMI Litig., 193 F.3d 613 (3d Cir. 1999) (admission of expert testimony); United States v. Iannone, 184 F .3d 214 (3d Cir. 1999)(sentencing decisions in criminal cases); Poulis v. State Farm Fire & Casualty Co., 747 F.2d 863 (3d Cir . 1984) (the dismissal of a complaint).

72

district courts denying parties' "excusable neglect" motions. In In re Orthopedic Bone Screw Pr ods. Liab. Litig., Judge Ambro observed that "[g]enerally we r equire further explanation of an order terminating a litigant's claim." In re Orthopedic Bone Screw Prods. Liab. Litig., 2001 WL 377052, at 5 (3d Cir. Apr. 16, 2001). He then asserted that " `[w]e have imposed a duty of explanation on District Courts when they conduct `excusable neglect' analysis.' " In re Orthopedic Bone Screw Prods. Liab. Litig., 2001 WL 377052, at 5 (quoting In re Cendant PRIDES Litig. , 233 F.3d 188, 196 (3d Cir. 2000)). In light of the majority's apparent understanding of what is required of district courts under Pioneer, as evidenced by the recent opinion in Orthopedic Bone Screw Prods., it is thor oughly perplexing to me that the majority fails to hold the District Court to that standard and instead takes on the District Court's job itself.

The precedent is clear: the District Court must satisfy its duty of explanation. When it does not, the case must be remanded for the District Court to do so. This conclusion is by no means a "leap of logic" as the majority suggests (Maj. Op. at 26-27 n.18); it is the proper and the only application of the rule of law in this Circuit.

In re Cendant PRIDES Corp. Litig., 235 F.3d 176 (3d Cir. 2000), relied upon by the majority as support for its own consideration of the Pioneer factors, is entirely distinguishable. In that case, our court reviewed the District Court's denial of a Rule 60(b) "excusable neglect" motion for an abuse of discretion. We concluded "that the District Court's decision [denying the motion for`excusable neglect'] was not consistent with the sound exer cise of its discretion." 235 F.3d at 181. Because we held that the District Court abused its discretion, we wer e obliged to reach the merits of excusable neglect and answer the "second question . . . : whether `excusable neglect' excused Santander's duty. . . This involves a review of the matter de novo, applying the law to the facts." 235 F .3d at 181.

It was only in that procedural posture--reviewing under a de novo standard--that we applied the Pioneer factors in Cendant PRIDES, 235 F.3d 176. Ther efore, by relying on that case, the majority is relying on a case in which we exercised de novo review in or der to support its actions in

73

this case where we must exercise abuse of discretion review. Such misplaced reliance does not constitute "merely following precisely what we did in" Cendant PRIDES, 235 F.3d 176, as the majority suggests. (Maj. Op. at 26-27 n.18.) That is, in effect, like saying that it is appropriate to reconsider facts already found by a jury because a prior appellate court had reviewed de novo a grant of summary judgment on a factually similar case. There is simply no language strong enough to describe how seriously the majority has erred. Its error not only affects the decision in this case, but it also confounds our jurisprudence involving our own standards of review.

Indeed, no matter how the majority tries to spin and justify its holding here and Judge Ambro's recent holding in Orthopedic Bone Screw Prods., in derogation of its own admonition that "[w]e [should] refrain from substituting our judgment for that of the District Court," see In re Orthopedic Bone Screw Prods. Litig. , 2001 WL 377052, at 5, it is the majority that has found: that the Davidsons do not qualify for the excusable neglect exception because their actions caused prejudice to Cendant; that their actions do not comport with the good faith requirement; that their claims would subject Cendant to additional liabilities; that permitting the Davidsons to opt out would deprive Cendant of the finality it bargained for; and that the Davidsons sought a strategic advantage in not filing a formal opt-out request. (Maj. Op. at 26-29.) These were findings that the District Court did not make but was obliged to make under Pioneer and was then obliged to include in its analysis. Nor can I understand why the majority has so blithely undercut our directions to the District Court which have now been emphasized not just once but at least twice in the Cendant cases. See In re Cendant Corp. PRIDES Litig., 235 F.3d 176 (3d Cir. 2000); In re Cendant Corp. PRIDES Litig., 234 F.3d 166 (3d Cir. 2000); see also In re Orthopedic Bone Screw Prods. Litig., 2001 WL 377052 (3d Cir . Apr. 16, 2001).

We have said, and this majority is bound by our holdings, that the District Court must satisfy its "duty of explanation . . . when . . . conduct[ing] `excusable neglect' analysis" under Pioneer. In re Cendant Corp. PRIDES Litig., 234 F.3d at 171; In re Orthopedic Bone Screw Prods. Litig., 2001 WL

74

377052, at 5. The District Court's mere citation of Pioneer and recitation of its factors do not satisfy this "duty of explanation." Nor, I suggest, does the majority's untoward attempt to furnish its own findings and its own explanations satisfy the excusable neglect standar d that the District Court failed to furnish itself. Now, it may well be that, had the District Court considered the Pioneer factors explicitly, it still could have reached its same conclusion. But that cannot excuse the District Court's flagrant failure to comply with this Court's mandate, nor can it excuse the majority for attempting to brush this issue under the carpet by substituting its discretion for that of the District Court.

V.

In conclusion, I am more than satisfied that the New Jersey District Court egregiously erred in enjoining the Davidsons' arbitration. After a review of the statutes and case law, there can be no question that the Davidsons' claims were properly in arbitration and the California Central District Court's decision to that ef fect precluded the New Jersey District Court from enjoining the arbitration.

Additionally, I am satisfied that the Davidsons did not fit within the class definition because their Cendant shares were not "publicly traded securities." Infinding that they were, the New Jersey District Court clearly err ed.

Finally, I believe that the New Jersey District Court, in failing to comply with the Supreme Court's and our own unequivocal directions, again clearly err ed in denying the Davidsons' request to extend the opt-out deadline without explaining the application of the Pioneer factors as it was required to do.

I therefore respectfully dissent, and I would reverse and vacate the District Court's order which enjoined an arbitration ordered by the Califor nia Central District Court.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

                        75